Daniel J. Pochoda (Bar No. 021979)
Victoria Lopez (Bar No. 330042)**
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85011-0148
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
         vlopez@acluaz.org
**Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Joshua S. Akbar (Bar No. 025339)
Dentons US LLP
2398 Camelback Road
Phoenix, AZ 85016-9007
Telephone: (602) 508-3947
Email: joshua.akbar@dentons.com

(Additional counsel listed in signature block)
Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ANTIGONE BOOKS L.L.C.; INTERGALACTIC, INC., D/B/A, BOOKMANS; CHANGING HANDS BOOKSTORE, INC.; COPPER NEWS BOOK STORE; MOSTLY BOOKS; VOICE MEDIA GROUP, INC.; AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION; ASSOCIATION OF AMERICAN PUBLISHERS; FREEDOM TO READ FOUNDATION; AND NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, | Civil Case No. |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| -v- | |
| TOM HORNE, in his capacity as Attorney General of the State of Arizona; MICHAEL B. WHITING, in his capacity as County Attorney of Apache County; EDWARD G. RHEINHEIMER, in his capacity as County Attorney of Cochise County; DAVID W. ROZEMA, in his capacity as County Attorney of Coconino County; | *(caption continued on next page)* |

BRADLEY D. BEAUCHAMP, in his capacity as County Attorney of Gila County; KENNY ANGLE, in his capacity as County Attorney of Graham County; DEREK D. RAPIER, in his capacity as County Attorney of Greenlee County; TONY ROGERS, in his capacity as County Attorney of La Paz County; BILL MONTGOMERY, in his capacity as County Attorney of Maricopa County; MATTHEW J. SMITH, in his capacity as County Attorney of Mohave County; BRAD CARLYON, in his capacity as County Attorney of Navajo County; BARBARA LAWALL, in her capacity as County Attorney of Pima County; LANDO VOYLES, in his capacity as County Attorney of Pinal County; GEORGE SILVA, in his capacity as County Attorney of Santa Cruz County; SHEILA POLK, in her capacity as County Attorney of Yavapai County; and JON R. SMITH, in his capacity as County Attorney of Yuma County,

Defendants.

Plaintiffs, by and through their undersigned attorneys, for their Complaint, allege:

**PRELIMINARY STATEMENT**

1.     The Arizona State Legislature has enacted, and the Governor has signed into law, an overbroad and content-based statute that criminalizes the display, publication, and sale of non-obscene images fully protected by the First Amendment. Under this law, House Bill 2515, 51st Leg., 2d Reg. Sess. (Ariz. 2014), ARIZ. REV. STAT. § 13-1425 ("H.B. 2515" or the "Act"), each of the following is a felony, punishable by up to three years and nine months in prison:

- A college professor in Arizona, giving a lecture on the history of the Vietnam War, projects on a screen the iconic Pulitzer Prize-winning photograph, "Napalm Girl," which shows a girl, unclothed, running in horror from her village.

- A newspaper and magazine vendor in Arizona offers to sell a magazine which contains images of the abuse of unclothed prisoners at Abu Ghraib.

- An educator in Arizona uses images, taken from the Internet, of breast-feeding mothers, in an education program for pregnant women.

- A bookseller in Arizona offers for sale the books, *Edward Weston: 125 Photographs* (Ammo Books 2011) or *Imogen Cunningham: On the Body* (Bulfinch 1998), each of which contains nude images.

- A librarian in Arizona includes, in the library's collection, the book *Robert Mapplethorpe and the Classical Tradition: Photographs and Mannerist Prints* (Guggenheim Museum Publications 2004), which contains nude images.

- A library in Arizona provides computers with Internet access to its patrons and, because no filters could effectively prevent this result, the library patrons are able to access nude or sexual images.

- A bookseller or publisher, based outside of Arizona, offers for sale to retailers or consumers within Arizona, or displays to such retailers or consumers, books containing nude but non-obscene images.

- Any person in Arizona, having bought one of these books, newspapers, or magazines, or borrowed it from a library, either in Arizona or out-of-state, shows a restricted image to a friend in Arizona.

- A mother in Arizona shares with her sister, in the privacy of her home, a nude image of her infant child.

- A sexual assault victim in Arizona shows a photograph of the naked assaulter to her mother.

3

Plaintiffs bring this action to have the Act declared unconstitutional, and its enforcement enjoined.

2.     H.B.  2515 was enacted with the stated goal of combating "revenge porn," a term popularly understood to describe conduct typified by a person knowingly and maliciously posting an identifiable, private image of an ex-lover online with the intent and effect of harming her reputation and damaging her personal and professional relationships.  While the state has a legitimate interest in addressing the real harms of revenge porn, any such law must be narrowly tailored to address that problem.

3.     The Act, however, is vastly overbroad in its reach.  It is not limited to disclosures motivated by revenge; in fact, the motive of the person making the disclosure is irrelevant under the law.  Nor is the law limited to pornography or obscene images. And the Act is not limited to digital speech: It equally criminalizes posting another's private photograph on a widely-accessed Internet site, showing a printed image to one friend, publishing a newsworthy picture in a textbook, and including a nude photograph in an art exhibition.

4.     The law, quoted in full below, makes it a crime to "intentionally disclose, display, distribute, publish, advertise, or offer a photograph" or other image of "another person in a state of nudity or engaged in specific sexual activities" if the person "knows or should have known" that the person depicted has not consented to "the disclosure."

5.     The law requires that consent be specific to *each* disclosure of any restricted image.  For example, a museum seeking to hold a photography exhibition including nude images cannot assume from the fact that the photographs were previously published or exhibited at another gallery that the depicted person has consented to "the" disclosure of the photographs in *its* exhibition.

6.     The Act also creates criminal liability for negligent speech.  A person who displays a restricted image risks criminal prosecution based on an allegation that he or she "should have known" that there was no consent.  Thus, a person who finds and re-posts a restricted image online could be prosecuted on the grounds that the person

4

"should have known" that the depicted person did not consent; the "re-poster" would have the same criminal liability as a knowing privacy invader who posted the original image without consent.

7.     To obtain a conviction under the Act, a prosecutor need not prove that any person was harmed by the disclosure.  Nor must a prosecutor prove that the person depicted was either recognizable or had a reasonable expectation of privacy in the image.

8.     The Act has no exception for images related to issues of public concern, including artistic, historical, or newsworthy images depicting nudity or sexuality.

9.     Plaintiffs include booksellers, book and newspaper publishers, librarians, photographers, content providers, and associations representing them, who offer, display, and sell a broad range of material protected by the First Amendment, including artistic, historical, and newsworthy materials.  Plaintiffs (or their members) offer and display nude and sexual images of cultural value and public concern – and do not always seek (and sometimes cannot seek) prior consent before publishing them.  Plaintiffs' readers, customers, patrons, and members include press photographers, users of the web and Internet, and persons who own, borrow, view, and read books and periodicals containing images restricted by the Act.  The Act directly infringes the First Amendment rights of Plaintiffs, their members, employees, patrons, and customers, who are among the millions of Arizonans, as well as persons outside of Arizona, whose actions may subject them to felony prosecution under the law.

10.     Plaintiffs seek declaratory and injunctive relief against enforcement of House Bill 2515, § 1, ARIZ. REV. STAT. 13-1425, on the grounds that: (1) the law is a content-based restriction on constitutionally protected speech, in violation of the First Amendment to the United States Constitution; (2) the Arizona State Legislature failed to tailor the law's reach to harmful, malicious, harassing, or privacy-invading conduct; (3) the law is overbroad; (4) the law is unconstitutionally vague; and (5) the law violates the Commerce Clause of the United States Constitution.

## JURISDICTION AND VENUE

11.    This case arises under the United States Constitution and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).  This action is brought pursuant to 42 U.S.C. § 1983.

12.    The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

13.    The Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b).  All Defendants are sued in their official capacities, and their official places of business are all located within this District.  The event giving rise to this Complaint is the enactment, within this District, of an unconstitutional statute of the State of Arizona.

## THE PARTIES

15.    Plaintiff ANTIGONE BOOKS, L.L.C. operates an independent bookstore in Tucson, Arizona, which has been in business for 40 years.  It carries a broad range of new and used books.  On its website, www.antigonebooks.com, visitors are able to obtain information, in both text and images, about Antigone Books and the titles it has available. The website currently advertises or offers for sale more than 9 million titles, including books, e-books, and audio books.  The books offered on its website are provided through the IndieBound application, or "app." The e-books offered on its website are provided through Kobo, a third party app.  Antigone Books also offers an e-mail newsletter discussing upcoming events, displaying new books, and other matters of interest.

16.    Some of the books for sale on Antigone Books' website and app, or displayed on the website and in the newsletter, include images of nudity or specific sexual activities, as defined by the Act.  Among the books for sale on Antigone Books' website and at its bookstore is *The Bodies of Mothers: A Beautiful Body Project* (Green Writers Press 2014) by Tucson-based photographer Jade Beall, who specializes in

therapeutic photography for women and whose projects have garnered global attention as body-positive art.  Also for sale and on display at Antigone Books are books featuring the photography of Robert Mapplethorpe, regarded as one of the most important artists of the twentieth century.  Among those books are *Lady: Lisa Lyon* (Bulfinch Press 1996), *Perfection in Form* (Te Neues Publishing Company 2009), *Robert Mapplethorpe: Polaroids* (Prestel Publishing 2013), *Mapplethorpe* (Te Nues Publishing Company 2007), *Robert Mapplethorpe: The Black Book* (Schirmer/Mosel 2010), and *Robert Mapplethorpe* (Skira 2014).  Also available for sale on the Antigone Books website are *The Abu Ghraib Investigations: The Official Independent Panel and Pentagon Reports on the Shocking Prisoner Abuse in Iraq* (Public Affairs 2004), and *Abu Ghraib: The Politics of Torture* (North Atlantic Press 2004).  These books contain essays and commentary examining the historical and political context of the Abu Ghraib scandal, excerpts from official reports, presidential memos, and photographs of abused prisoners in a state of nudity.  A preview of the pages of *Abu Ghraib: The Politics of Torture* is available on the Antigone Books website; one page shows a fully nude prisoner cowering before a barking dog.

17.     All of these books contain people in a state of nudity.  Antigone Books knows that the individuals depicted in Beall or Mapplethorpe's photography have not consented to Antigone Books' specific display or sale of their images, and Antigone Books does not know the circumstances under which these images were taken, including whether subjects were paid to pose, and whether the images were taken in a public or commercial setting.  Antigone Books knows that photographs of torture victims at Abu Ghraib were taken and shared without the subjects' consent.  Plaintiff Antigone Books has not secured the consent of any person depicted nude in these images, and in many instances would have no way of doing so.

18.     Plaintiff INTERGALACTIC, INC. d/b/a BOOKMANS ENTERTAINMENT EXCHANGE ("Bookmans") is the largest used book retailer in Arizona.  Bookmans has been buying, selling, and trading books for over 30 years.  Bookmans operates a total of six used book stores with locations in Tucson, Phoenix, Mesa, and Flagstaff, Arizona.

Bookmans sold approximately 1.4 million books in its stores last year alone; between all six of its stores, Bookmans offers approximately 1.2 million books for sale at any given time.  Bookmans also displays and offers around 120,000 titles for sale on its website, http://www.bookmans.com, as well as on Amazon Marketplace, AbeBooks, Alibris, and eBay.  The vast majority of what each Bookmans store offers for sale is used; the in-store inventory reflects what its customers bring in to trade.  Bookmans maintains an entire arts section in each store, often devoting six shelves or more to art or photography books.  Bookmans also sells music, movies, magazines, and other media.  Some of these books and media contain images of persons engaged in specific sexual activities or in a state of nudity as defined in the Act.

19.     Bookmans buys and sells many books and publications of great historic and political significance which contain images of nudity where the depicted person consented neither to the taking of the photograph nor to its publication, let alone the specific display or sale of such publication by Bookmans.  Among the books for sale in Bookmans' Speedway store in Tucson, Arizona is *Moments: The Pulitzer Prize Photographs*.  This book includes such iconic images as the Marines raising the U.S. flag in Iwo Jima in 1945, Babe Ruth's final salute to Yankee stadium in 1949, Lee Harvey Oswald wincing in pain as he is shot in 1964, President Ronald Reagan being tackled into his limousine after the 1982 assassination attempt, and the 1972 Pulitzer Prize-winning photograph by Nick Ut of a Vietnamese girl fleeing a village that was being bombed with napalm.  The nine-year-old girl in that iconic image, often called "Napalm Girl," appears in what is now called "full frontal nudity."  She did not consent to the taking of the photograph, likely did not consent to its initial publication, and did not consent to its sale at Bookmans' Tucson location.   Nor was she "voluntarily" nude; according to *Moments*, she tore off her clothes to escape the fire, which had seared her back.

20.     Plaintiff CHANGING HANDS BOOKSTORE, INC. ("Changing Hands") is an award-winning independent bookstore with locations in Tempe and Phoenix, Arizona.  Changing Hands has been in business at its Tempe location for 40 years.  It opened its

second location in Phoenix in May of this year.  At both locations, Changing Hands sells books in a variety of genres including fiction, non-fiction, memoirs, history, photography, and self-help books.  Changing Hands sends out an e-mail newsletter to individuals that lists titles for sale, events hosted by the bookstore, and staff recommendations, and also operates an Internet site at http://www.changinghands.com, which among other things, offers books for sale.

21.    At its Tempe location, Changing Hands operates a book trade program where customers receive store credit in exchange for gently used books that Changing Hands Bookstore believes it can re-sell.  Changing Hands Bookstore also accepts donated books.  Much of what Changing Hands Bookstore offers for sale is used; the in-store inventory reflects what its customers bring in to trade.  Some of those titles displayed or sold by Changing Hands Bookstore contain photographs of whole or partial nudity, as defined in the Act.

22.    Among Changing Hands' inventory are several photography books including photographs by Edward Weston.  Arizona's Center for Creative Photography houses his archives, and hails Weston as one of the twentieth century's most influential art photographers.  Among the books including Weston photographs that Changing Hands offers for sale are *Edward Weston & Harry Callahan: He, She, It* ( La Fabrica/Fundacion Banco Santander 2013), *Edward Weston: Nudes* (Aperture 1993), and *Edward Weston's Book of Nudes* (Getty Publications 2007).  Each of these books contains photographs of persons "in a state of nudity."

23.    Changing Hands offers thousands of books for sale.  By vetting the publishers, Changing Hands can be confident that all of the books are protected by the First Amendment; that is, that none of the books is obscene.  Many reputable publishers publish books containing images that are (or could be) prohibited by the Act but do not vet books according to compliance with Arizona law.  Changing Hands cannot review every book to determine whether it contains a nude image, let alone to ascertain whether the person depicted consented to the initial disclosure.  It is impossible for many of the

persons depicted to have consented to Changing Hands' display or sale of these images, because they passed away before publication of the book and its sale or donation to Changing Hands.

24.     Plaintiff COPPER NEWS BOOK STORE is a small, independent bookstore in Ajo, Arizona, a town of about 4,000 people in southwestern Arizona, about 120 miles southwest of Phoenix and 130 miles west of Tucson.  Ajo was originally a mining town, and is now a retirement community.  The bookstore has been in business since 1998, and is affiliated with *Ajo Copper News*, a weekly newspaper which has been published since 1916, and is now published in both paper and digital form.  Copper News Book Store sells a broad range of books, including art and photography books.  About half of the books sold in the store are used books.  Copper News Book Store also sells books online, through AbeBooks and Amazon.  Copper News Book Store does not routinely review its inventory to determine whether any books in its stock contain images of nudity or sexual activities. . A partial inventory review in response to the Act revealed at least two publications that contain images of nudity restricted by the Act: *Borneo Scene* (Anna Photo Company, Kuching, Malaysia 1979) and *The New Sensual Massage* (Bantam Dell Publishing Group 1994).

25.     Plaintiff MOSTLY BOOKS is an independent bookstore located in Tucson, Arizona.  Mostly Books has been in business for 26 years.  Mostly Books stocks over 100,000 books in its store.  It offers a range of new and used books for sale, including fiction, non-fiction, photography, history books, and vintage National Geographic magazines; the majority of books it carries are used.  Some of the books carried by Mostly Books contain photographs of persons engaged in specific sexual activities or in a state of nudity, as defined by the Act.  Mostly Books also operates a website at www.mostlybooksaz.com, which offers information, both written and pictorial, about Mostly Books, events hosted by the bookstore, book clubs organized by the bookstore, staff recommendations, and the books it has for sale in store and through its website.  The database of books for sale on the Mostly Books website is provided by Ingram Book

Group, Inc., a responsible third party; there are currently more than 8 million titles for sale on the website. Mostly Books also sells e-books available on its website through Kobo. Mostly Books also runs the Mostly Books Affiliate Program, through which other websites host book ads which drive traffic to Mostly Books' website and often result in sales. Some of the books and e-books available on the Mostly Books website and app, or displayed on the website or affiliate ads, include images of persons engaged in specific sexual activities or in a state of nudity, as defined in the Act.

26. Among the books for sale in Mostly Books' inventory are *Moments: The Pulitzer Prize Photographs* (Black Dog & Leventhal Publishers 1999), and several photography books including photographs by Modernist artists and contemporaries Imogen Cunningham and Edward Weston. Cunningham, whose work is in the permanent collection at the Museum of Modern Art and the Library of Congress, is renowned as one of the greatest American women photographers. Books including Cunningham and Weston photographs which Mostly Books offers for sale include *Group f.64: Edward Weston, Ansel Adams, Imogen Cunningham, and the Community of Artists Who Revolutionized American Photography* (Bloomsbury USA 2014), *Imogen Cunningham* (Zeitgeist Films 2013), *Edward Weston* (Taschen 2013), *Imogen Cunningham: Ideas without End* (Chronicle Books 1993), *Edward Weston: 125 Photographs* (Ammo Books 2011), *Imogen Cunningham: Portraits* (Bulfinch Press 1998), *Edward Weston: Portraits* (Aperture 2005), and *Edward Weston* (Skira 2013). Each of these books contains photographs of persons in a state of nudity.

27. In working with established and trusted publishers, Mostly Books knows that that none of the books it displays or offers is obscene or qualify as child pornography. Many reputable publishers screen for images that are not protected by the First Amendment, but publish books containing images that might be prohibited by the Arizona Act. In addition, the particular titles displayed on Mostly Books' website or app are derived from a database maintained by a trusted third party, which ensures that the books are not obscene but does not screen books for compliance with the Act. Mostly

Books cannot review every book or website display to determine whether it contains a nude image, or the broad category of "sexual activities."  If it did seek to comply with the Act, it would lose profit by eliminating all books with nude or sexual photographs from its store and online inventories, and would likely lose further business due to its apparent incomplete or inadequate catalogue of books.

28.     Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was organized as a non-profit organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry, and the public about the dangers of censorship, and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials.  ABFFE is incorporated in Delaware, and has its principal place of business in New York City. Most of ABFFE's members are bookstores in the United States, including Arizona. ABFFE's members offer and sell First Amendment-protected books, magazines, and papers, both from their stores and online, some of which contain non-obscene images of persons engaged in specific sexual activities or in a state of nudity, as defined by the Act. ABFFE sues on its own behalf, on behalf of its members (including its Arizona members and its members outside of Arizona that offer and/or sell books and other materials to persons in Arizona or that maintain websites accessible in Arizona), and on behalf of the patrons of its member bookstores.

29.     Plaintiff VOICE MEDIA GROUP, Inc. ("VMG") is the largest group of metropolitan newsweeklies in the United States, publishing papers in eleven geographic areas: Phoenix, New York, Los Angeles, Denver, Houston, Dallas, St. Louis, Miami, Minneapolis, Broward County, and Orange County.  The company's namesake *Village Voice* was founded in New York City in 1955, and is the winner of three Pulitzer Prizes. VMG is also publisher of the *Phoenix New Times*, founded in 1970 by students of Arizona State University, to provide an alternative source of news and perspective on local politics, business, food, culture, arts, and music, as well as events listings for Phoenix, Arizona.  Its reports on state and local government, and on the state court

system, have earned *Phoenix New Times* a reputation for investigative journalism across the state.  In addition to its print holdings, VMG owns a series of websites that publishes daily blog posts, restaurant and location listings, slideshows, and concert and events calendars.  Many of the news stories and picture galleries available on VMG's websites and in its print weeklies, including the *Phoenix New Times*, feature images of persons in a state of nudity or engaged in specific sexual activities, as defined in the Act.

30.    For example, the *Phoenix New Times* has published images that fall within the Act's definition of nudity because they show small portions of the lower female breast, but that most people would not consider sexually explicit or nude.  These images include copies of photographs exhibited in local art shows; images of local people at ticketed, guest-restricted events; and links to images of public figures.  VMG has also posted images of former Representative Anthony Weiner's erect, clothed genitalia, which falls within the Act's definition of "sexual activities."  VMG did not secure individualized consent from any of the people pictured in the above stories; however, each image was newsworthy, and none contained what the average viewer would consider "nudity."

31.    Arizona law enforcement has a history of enforcing the criminal law against media organizations engaged in protected speech.  In 2007, law enforcement officers arrested two co-founders of the *Phoenix New Times*, in nighttime warrantless raids of their homes, for printing articles about broad grand jury subpoenas they had received from the Maricopa County Attorney's office – subpoenas seeking reporters' notes, tapes, confidential sources, and records from every story written about Sheriff Joe Arpaio over a period of years.  Further, they sought the IP addresses, cookies, and Internet browsing habits of anyone who read certain *New Times*' stories critical of Sheriff Arpaio, *and* information about every visitor to the *New Times*' website over a period of years.  Following public outcry, Maricopa County terminated the grand jury investigation and ultimately settled the *New Times* founders' false arrest claims for $3.75 million.  In 2008, VMG and the *Phoenix New Times* published on their websites a series of images

taken by Arizona artist and Arizona State University Professor Betsy Schneider of her own children, and included thumbnail images of naked babies from her art exhibition in downtown Phoenix.  Maricopa County also considered opening a police investigation into the *New Times*' publications of these images.  A Phoenix city attorney told local press that if the photos were found to be illegal, "Everybody who picked up one those issues (of the *New Times*) could be prosecuted for possessing child pornography."[1]

32.    Plaintiff ASSOCIATION OF AMERICAN PUBLISHERS, INC. ("AAP") is the national association in the United States of publishers of general books, textbooks, and educational materials.  Its approximately 300 members include most of the major commercial book publishers in the United States and many smaller or non-profit publishers, including university presses and scholarly associations.  AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States, some of which include images of nudity or sexual conduct.  Its members are active in all facets of electronic media, including publishing a wide range of electronic products and services.  Additionally, members of AAP maintain websites featuring and offering for sale their publications, some of which include images of persons engaged in specific sexual activities or in a state of nudity, as defined by the Act.  AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment.  AAP sues on behalf of its members, and on behalf of the readers of its members' books.

33.    Under the terms of the Act, several broad categories of mainstream, non-obscene books published by AAP members regularly include images of persons in a "state of nudity" or engaged in "specific sexual activities."  These books include, among others: (a) biology texts, which contain images of the naked body (or portions of the body) for instructional purposes; (b) health and sex education books including, for

---

[1] Ass'n Alt. Newsmedia, *Police Department 'Reviewing' Phoenix New Times Photos*, AAN, Aug. 19, 2008, *available at* http://www.altweeklies.com/aan/police-department-reviewing-phoenix-new-times-photos/Article?oid=485863.

example, books about breastfeeding; (c) histories and public affairs books, including images taken at crime scenes, at disaster scenes, and in conflict and war zones; (d) sports books, which may include congratulatory "erotic touching" of the buttocks; (e) photography books, which include artistic nude images; and (f) books about celebrities, which include images of women in swimwear or low-cut gowns that reveal a side or bottom portion of the breast below the areola (even though the areola and nipple are fully covered).

34.     Plaintiff FREEDOM TO READ FOUNDATION, INC. ("FTRF") is a non-profit membership organization established in 1969 by the American Library Association to promote and defend First Amendment rights; to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen; to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire; and to set legal precedent for the freedom to read on behalf of all citizens.  FTRF also promotes free Internet access, opposes the filtering of constitutionally protected material in public libraries, and sponsors the American Association of School Librarians' annual Banned Websites Awareness Day.  FTRF is incorporated in Illinois and has its principal place of business in Chicago.  Its members include libraries and librarians throughout the United States, including in Arizona.  FTRF sues on its own behalf, on behalf of its members, and on behalf of the employees and patrons of its member libraries.

35.     FTRF member libraries, including its Arizona members, provide their patrons with computers which the patrons can use to access the Internet.  The only practical way to comply with the Act, for libraries, librarians, and library employees in Arizona, would be to heavily filter or terminate the availability of all Internet access.  Furthermore, FTRF member libraries' online public access catalogs include many works containing non-obscene images which are restricted under the Act.  Arizona members would appear obligated to remove these works from their online public access catalogs, because while the images might not appear online, listing the restricted books online

would be "offering" the images.  Moreover, the websites of non-Arizona FTRF member libraries can be accessed, via the Internet, from Arizona. Many of those non-Arizona libraries participate in Interlibrary Loans to Arizona libraries.  To comply with the Act, the non-Arizona libraries would have to either (a) set up a restriction on the Interlibrary Loan program to ensure that restricted works were not loaned to Arizona libraries or persons in Arizona, or (b) to maintain a uniform Interlibrary Loan program, remove such restricted works entirely, thus denying libraries in other states the opportunity to borrow such works.

36.     Plaintiff THE NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION ("NPPA") is the leading voice advocating for the work of visual journalists in the U.S. today.  It is dedicated to the advancement of visual journalism – its creation, practice, training, editing, and distribution – in all news media, and works to promote its role as a vital public service.  Founded in 1946 in the days of sheet film box cameras and newsreels, NPPA fights for the First Amendment rights of the working news photographer, videographer, and multimedia journalist in the Internet age.  The NPPA encompasses the three facets of visual journalism – still images, video, and multimedia – and reflects the comprehensive, modern transformation of the industry and the association's nearly 7,000 constituents.  NPPA sues on its own behalf and on behalf of its members.

37.     NPPA members take photographs at crime scenes, at disaster scenes (such as earthquakes, floods, and tornados), in prisons, and in war or conflict zones where persons may be in a state of nudity involuntarily.  For example, Nick Ut, an NPPA member photographer, took the iconic image of a young woman fleeing a napalm attack in Vietnam, her clothing disintegrated by napalm fire.  NPPA member and photojournalist Mickey Osterreicher was a press photographer present at the inmate uprising at Attica prison in western New York; hundreds of prisoners rebelled, seized control of the prison, and took hostages.  National Guardsmen and state and local police stormed the prison to regain control, leaving dozens dead, both inmates and hostages.  Among the searing images from the prison riot were photographs after the police

regained control of the prison: Hundreds of inmates, ordered to strip naked, stood in the prison yard, surrounded by guards.  These images are widely available on the Internet and in publications.

38.   Defendant TOM HORNE, as the Attorney General of the State of Arizona, is the state's chief law enforcement officer and is sued in his official capacity.  Attorney General Horne retains general prosecutorial authority to ensure that the laws of Arizona are faithfully executed and has supervisory authority over county and local prosecutors. Pursuant to ARIZ. REV. STAT. § 41-192, Attorney General Horne "shall have charge of and direct the department of law and shall serve as chief legal officer of the state."

39.   The following Defendants are the County Attorneys for each of Arizona's counties, and as such are responsible for prosecuting crimes in Arizona pursuant to ARIZ. REV. STAT. § 11-532, and are sued in their official capacities: MICHAEL B. WHITING, in his capacity as County Attorney of Apache County; EDWARD G. RHEINHEIMER, in his capacity as County Attorney of Cochise County; DAVID W. ROZEMA, in his capacity as County Attorney of Coconino County; BRADLEY D. BEAUCHAMP, in his capacity as County Attorney of Gila County; KENNY ANGLE, in his capacity as County Attorney of Graham County; DEREK D. RAPIER, in his capacity as County Attorney of Greenlee County; TONY ROGERS, in his capacity as County Attorney of La Paz County; BILL MONTGOMERY, in his capacity as County Attorney of Maricopa County; MATTHEW J. SMITH, in his capacity as County Attorney of Mohave County; BRAD CARLYON, in his capacity as County Attorney of Navajo County; BARBARA LAWALL, in her capacity as County Attorney of Pima County; LANDO VOYLES, in his capacity as County Attorney of Pinal County; GEORGE SILVA, in his capacity as County Attorney of Santa Cruz County; SHEILA POLK, in her capacity as County Attorney of Yavapai County; and JON R. SMITH, in his capacity as County Attorney of Yuma County.

FACTS

**The Statute**

40.    On April 30, 2014, Governor Jan Brewer signed H.B. 2515 into law.  The Act amends Section 1, Title 13, Chapter 14, of the Arizona Revised Statutes by adding a new crime, section 13-1425, entitled the "unlawful distribution of images."

41.    The Act provides:

A. It is unlawful to intentionally disclose, display, distribute, publish, advertise, or offer a photograph, videotape, film or digital recording of another person in a state of nudity or engaged in specific sexual activities if the person knows or should have known that the depicted person has not consented to the disclosure.

B. This section does not apply to any of the following:

1. Lawful and common practices of law enforcement, reporting unlawful activity, or when permitted or required by law or rule in legal proceedings.

2. Lawful and common practices of medical treatment.

3. Images involving voluntary exposure in a public or commercial setting.

4. An interactive computer service, as defined in 47 United States Code Section 230 (f)(2), or an information service, as defined in 47 United States Code Section 153, with regard to content provided by another person.

C. A violation of this section is a class 5 felony, except that a violation of this section is a class 4 felony if the depicted person is recognizable.

D. For the purposes of this section, "state of nudity" and "specific sexual activities" have the same meaning prescribed in section 11-811.

House Bill 2515, ARIZ. REV. STAT. 13-1425 § 1.

42.    The Act incorporates these definitions:

14. … "[S]tate of nudity" means any of the following:

      (a) The appearance of a human anus, genitals or a female breast below a point immediately above the top of the areola.

      (b) A state of dress that fails to opaquely cover a human anus, genitals or a female breast below a point immediately above the top of the areola.

    * * *

    18. "Specific sexual activities" means any of the following:

      (a) Human genitals in a state of sexual stimulation or arousal.

      (b) Sex acts, normal or perverted, actual or simulated, including acts of human masturbation, sexual intercourse, oral copulation or sodomy.

      (c) Fondling or other erotic touching of the human genitals, pubic region, buttocks, anus or female breast.

      (d) Excretory functions as part of or in connection with any of the activities under subdivision (a), (b) or (c) of this paragraph.

ARIZ. REV. STAT. § 11-811(D)(14), (18).  These definitions are borrowed wholesale from Arizona's code chapter governing "County Planning and Zoning."

43.     If the person depicted is neither identified nor identifiable, a violation of the Act is categorized as a level 5 felony, which carries a presumptive sentence for a first conviction of six months to thirty months' imprisonment, ARIZ. REV. STAT. § 13-702(D). If the person depicted is "recognizable" in any way, however, the same conduct may be charged as a level 4 felony, which carries a presumptive sentence for a first conviction of one year to three years and nine months' imprisonment, ARIZ. REV. STAT. § 13-702(D).

44.     Whether or not the person depicted is identifiable, violations of the Act are categorized under the section of Arizona code setting forth sexual offenses, and may also constitute crimes of domestic violence depending on the relationship between the

discloser and the person pictured. ARIZ. REV. STAT. § 13-3601(A).  Section 1 of H.B. 2515 amends Chapter 14 of Arizona's Criminal Code, Relating to Sexual Offenses, by adding the crime of "[u]nlawful distribution of images," codified at ARIZ. REV. STAT. § 13-1425.  Thus, a violation of the law may be a felony sex offense.

45.    ARIZ. REV. STAT. § 13-3821 includes a catch-all provision permitting a judge to require anyone found guilty of any violation of Chapter 14 to register publicly as a sexual offender if the offense involves "a finding of sexual motivation."  Thus, a conviction under the Act may also require registration as a felony sex offender.

46.    Section 2 of H.B. 2515 amends Chapter 36, Relating to Family Offenses, by including ARIZ. REV. STAT. § 13-1425 among the list of enumerated offenses that qualify in certain circumstances as crimes of domestic violence.  *See* ARIZ. REV. STAT. § 13-3601(A) (Relating to Domestic Violence: definition; classification; sentencing options; arrest and procedure for violation; and weapon seizure).  Thus, under circumstances defined in ARIZ. REV. STAT. § 13-3601(A) of the Arizona Criminal Code, the crime of "[u]nlawful distribution of images" may be investigated, charged, and sentenced as a crime of domestic violence.

47.    The Act took effect on July 24, 2014.

48.    Since, under the Act, only specified nude or sexual images require individualized consent before they may legally be offered or shared in any manner, the Act is a content-based criminal restriction on non-obscene speech.

49.    The Act makes no distinction between images that are published with malice or wrongful intent and those that are not.  For example, under the Act, a woman who received an unsolicited photograph of a man's penis could be convicted of a felony if, alarmed by the communication, she shared the photograph with a friend.  Indeed, a rape victim who showed a photograph of the naked rapist to her mother could be convicted of a felony.  (The Act might permit her to use the photograph to report the crime, but would make her a felon if she showed the photograph to a relative, or posted the photograph online to seek help identifying her rapist.)

50.     The Act makes no distinction between images that cause harm to the person or persons pictured and those that do not.  Furthermore, the Act imposes criminal liability for the display of images where the person depicted is neither identified nor identifiable (but, as noted above, imposes more severe punishment if the person depicted is recognizable).

51.     The Act makes no distinction between images in which the person or persons pictured have a reasonable expectation of privacy and those in which they do not. For example, a person could be convicted of a felony for sharing a photograph that no reasonable person would consider private, such as a naked image self-published on a widely-accessible website, or an archival copy of *Life* magazine containing photos of naked victims of the Holocaust.

52.     The Act has no exceptions for images related to matters of public concern, including those as to which consent was not, or could not be, obtained because of the circumstances of the photograph.  For example, a person could be convicted of a felony for sharing the "Napalm Girl" photograph, certain of the Abu Ghraib photographs, or the widely published lewd photo sent out by a (now former) U.S. Congressman.

53.     The Act has no exceptions for artistic images, including those where consent can no longer be obtained because of the death or unavailability of the person depicted.  For example, a person could be convicted of a felony for loaning a copy of innumerable books of great artistic value, such as *Edward Weston: 125 Photographs* (Ammo Books 2011), or *Imogen Cunningham: On the Body* (Bulfinch 1998), or *Robert Mapplethorpe and the Classical Tradition: Photographs and Mannerist Prints* (Guggenheim Museum Publications 2004).

54.     The Act criminalizes any intentional disclosure; "intentional" is defined in Arizona's criminal code as with an "objective to cause that result or engage in that conduct" – here, disclosure.  An intentional act requires no "culpable mental state." ARIZ. REV. STAT. ANN. § 13-202.

55.     The Act fails to define what conduct, and particularly what online activity, is included in the terms "disclose, display, distribute, publish, advertise," and "offer." Those terms could be construed widely to include merely recommending a restricted image or "linking to" the image online.

56.     The Act's definition of "state of nudity" is expansive and includes images that are commonplace, non-obscene, and do not implicate acute personal privacy interests.  For example, because the Act defines the portion of the female breast that must be opaquely covered as that "below a point immediately above the top of the areola," the Act criminalizes images of low cleavage or side or bottom views of the breasts even if the areola is fully and opaquely covered.  Such images are common in swimwear, street fashion, and gowns worn on gala occasions and "the red carpet."

57.     Similarly, the Act's definition of "specific sexual activities" is expansive and covers benign images.  An image of a person placing a hand on a fully clothed buttock, including his own, may constitute a "specific sexual activit[y]."  Accordingly, offering or disseminating a photograph of such an act, without first obtaining consent from the person depicted, is a felony in Arizona.

58.     The Act also includes a number of vague and undefined terms that increase its chilling effect.  The Plaintiffs do not know what is meant by the exception for images taken in a "public setting;" for example, whether presence on private property (such as a mall, a store, or a private home where others are present) can be a "public setting," or whether the number of people present is determinative.

59.     What is meant by the exception for a "commercial setting" is, similarly, unclear: Plaintiffs do not know whether the physical location where a photograph is taken is determinative, whether remuneration to the depicted person is a necessary component, or whether the intended use of the image is determinative.  Further, Plaintiffs do not know how to ascertain any of these factors with certainty from merely viewing an image.

**The Statute's Consent Provision**

60.     The Act provides that a person is criminally liable if he or she knew or "should have known" that the depicted individual has not consented "to *the* disclosure." ARIZ. REV. STAT. § 13-1425(A) (emphasis added).

61.     The use of the definite article "the" in combination with the noun "disclosure" signifies that consent must be granted for the *discrete act of disclosure*. Under the Act, the fact that the person depicted consented to being photographed, and consented to the prior display or publication of the nude image, is not sufficient to establish that the person depicted consented to any further display, publication, or offer of the image.

62.     The legislative record of H.B. 2515 confirms this interpretation.  The bill's sponsor, Representative Mesnard, stated during the bill's hearing in the House Judiciary Committee: "We as a society really have a collective responsibility beyond just the person who initially posts it or we are giving an out to the next person who just passes it along."  Statement of Rep. Mesnard, Arizona State Legislature, Judiciary Committee Hearing (February 6, 2014) at 01:49:45—01:52:12.  The language of consent in the bill is essentially unchanged from the version then up for debate, other than the removal of a requirement of *written* consent.  Upon information or belief, no other statement in the record or the text of the Act reflects a legislative intent to limit the reach of the law to initial posters or malicious actors.

63.     Because it appears that consent to the specific disclosure is required, a publisher could be convicted of a felony for including a restricted photograph in a book, even if the publisher knew that the depicted person had previously consented to having the photograph taken, or exhibited in an art gallery, if the depicted person did not specifically consent to the publication of the photograph in the book.

64.     The Act provides no notice of the nature, form, duration, or scope of the requisite consent.

65.     The Act also appears to permit the depicted person to revoke consent to disclosure, even where the image was taken with the understanding or explicit agreement that it would be disclosed, and the image is lawfully possessed by the person making the disclosure.  For example, a person who knowingly posed in the nude for a photograph, with the explicit agreement that it would be publicly distributed, but who later regretted the photograph, or sought but was unable to obtain additional compensation for having posed, could revoke consent and turn further exhibition of the photograph into a felony. This is true even when the depicted person has no expectation of privacy in the picture, and where the photographer legally took, possessed, and initially displayed the image.

66.     The standard by which a finder of fact is to determine whether a person "should have known" that the person depicted did not consent to the disclosure is even more unclear.  Plaintiffs worry, but cannot be certain, that the negligence standard imposes a due diligence obligation on a publisher, or bookstore owner, or librarian, to ascertain whether consent was given to an initial or subsequent display of any image. Plaintiffs who publish and sell media, who assume that valid consent has been given by persons depicted, worry that they may be subjected to criminal liability if a finder of fact were to conclude that this assumption was inadequate, and that the publisher should have known that the consents were not given, or were not given validly.

67.     Further, the Act makes no provision for implied consent to subsequent disclosures based on the manner or medium in which an image is initially disclosed. Instead, anyone who innocently republishes or redisplays a nude or sexual image, either online or by showing it to a friend, risks criminal liability under the Act.  For instance, sharing an image of a woman who willingly and intentionally posts her own nude photograph on a public website could lead to criminal charges against anyone who linked to, "advertised," or re-posted that photograph, if the person did not obtain permission for the subsequent disclosure of the image and "should have known" that the depicted person did not consent to further disclosure.

68.     Thus, any time someone shares a lawfully obtained, consensually viewed, or consensually possessed image without express permission, she or he may face criminal liability under the terms of the Act.

**The Act's Burdens on Plaintiffs' Ability to Engage in Protected Speech**

69.     Plaintiffs interact with and use nude or sexual images in a wide variety of ways, including as newsworthy content, artistic expression, and social activism.  The Act burdens Plaintiffs in all of these protected activities.  Plaintiffs who are users and content providers are subject to the Act.  These Plaintiffs fear prosecution under the Act for disclosing, displaying, distributing, publishing, advertising, or offering nude or sexual images without specific consent to each use.  Plaintiffs have no way to ensure that they may avoid prosecution under the Act.  They are therefore left with two equally untenable alternatives: They may (1) risk prosecution under the law, or (2) engage in self-censorship and thereby deny constitutionally protected information and expression to themselves and their audiences.

70.     Plaintiffs Antigone Books, Bookmans, Changing Books, Copper News Book Store, Mostly Books, ABFFE and its members, AAP's members, and FTRF and its members reasonably fear prosecution under the Act for their publication, display, and distribution of books and other materials containing non-obscene, restricted images of artistic interest, scholarly interest, and public interest, whether in the "bricks and mortar" world, in print advertising, or on websites.  Some of these images were almost certainly taken and initially shared without consent, such as "Napalm Girl" and the photographs of Abu Ghraib.  As to other images, Plaintiffs cannot be sure.  Plaintiffs' ability to offer, sell or loan such books and other materials will be seriously infringed by the Act if it is not enjoined because they will be forced to self-censor or risk prosecution.

71.     Press photographers who are members of Plaintiff NPPA (including those resident in Arizona) reasonably fear prosecution under the Act for taking, publishing, or even showing to others restricted images, however newsworthy, because they may not be able to obtain consent from those depicted.  NPPA members would be prevented from, or

penalized for, offering for sale or publishing newsworthy images under the Act when the depicted person dies shortly after the images have been taken, or where the circumstances of the photograph – such as at crime scenes and during wartime – make consent difficult or impossible to obtain.  In addition, the Act burdens the press photographers' free speech rights because it authorizes the subject of a newsworthy photograph to deny prior consent and thus criminalize the publication of the photograph.  The Act will seriously infringe the NPPA and its members' free speech rights if it is not enjoined because these individuals will be forced to self-censor or risk prosecution.

72.     Plaintiff Voice Media Group, Inc. reasonably fears prosecution under the Act for its publication, display and distribution of media containing non-obscene images of artistic interest, scholarly interest, and public interest, whether in printed publications or on its members' websites.  In addition, the Act also burdens VMG's free speech rights because it authorizes the subject of a newsworthy photograph to deny prior consent and thus criminalize the publication of the photograph.  This is a particular hardship in Arizona, where VMG member publication the *Phoenix New Times* and its employees have previously been investigated and arrested for engaging in speech protected by the First Amendment.  VMG and its member publications will be seriously harmed by the Act if it is not enjoined, because they will be forced to self-censor or risk felony prosecution.

**The Act's Burden on Plaintiffs' Ability to Receive Protected Speech**

73.     As a consequence of assigning felony consequences to the display of protected speech, the Act burdens the rights of Plaintiffs and others to receive and view protected speech and images.  As noted above, Plaintiffs and numerous parties not before the Court are likely to self-censor to avoid the extreme criminal penalties of violating the Act.  Any reduction on the amount of protected speech and images directly impinges on the public's right to find, hear of, receive, and view images of non-obscene nudity and sexuality.

74.     Images prohibited by the law include political and newsworthy images containing information in the public interest, such as evidence of improper conduct by government actors, the brutal consequences of war, war crimes, and torture, and images related to health education.  As a result, the Act deprives the public of access to images at the very core of the First Amendment's protections.

**The Act's Burden on Online Speech**

75.     The Act's constitutional deficiencies are further compounded when applied to online activity.

76.     The Act restricts all speech, including digital content.  This means that any image posted or shared on Instagram, Facebook, or Twitter; "offered or advertised" in any online forum; or shared privately in an instant message or email attachment is subject to the Act.  The Act's prior consent requirement creates a vast and vague censorship regime for the web, delegating to private persons – most unknown by the viewer – the power to regulate the speech of others.

77.     The Internet in general, and the worldwide web in particular, represent the most participatory marketplace of mass speech.  The web vastly decreases the cost and difficulty of sharing content, and consequently means that the number of Americans who "disclose, display, distribute, publish, advertise, or offer a photograph, videotape, film or digital recording" online is incredibly vast.  As this Act includes no specific intent requirement or knowledge of the context behind any particular image in order to incur criminal liability, the simple act of sharing or linking to an image that includes nudity or sexuality – extremely common online behavior – is sufficient to place an Internet user within the Arizona law's reach.

78.     The number of readers and Internet users who could be subject to the law – or, conversely, who could be self-censoring to avoid its broad and ambiguous reach – is inestimable.

**The Act's Burden on Interstate Commerce**

79.     The Act does not define what conduct will subject a person to Arizona's criminal jurisdiction:  Whether it is the state citizenship or location of the depicted person, the place where the restricted image was disclosed, or the location of the viewing of a restricted image.

80.     The Act unjustifiably burdens interstate commerce and regulates conduct that occurs wholly outside the borders of Arizona, thereby causing irreparable harm. Like the nation's railways and highways, the Internet is by its nature an instrument of interstate commerce.  Just as goods and services travel over state borders by train and truck, information flows across state (and national) borders on the Internet.  The various sites on the Internet can be accessed by anyone in the world; therefore there is no feasible way for speakers to ensure that residents of Arizona will not receive their communications.

81.     The Act impacts the speech of online speakers across the nation, not just in the State of Arizona, because it is practically and economically unfeasible for most Internet users to determine the geographic location of persons who access their information.  Just as a user of the Internet cannot identify the age of another user of the Internet, one also cannot identify where a particular user or speaker resides, or from where a particular user may be accessing or downloading information on the Internet.  A website operator or online content provider may not know that its service provider routes data through a server in Arizona or that Arizonans are viewing or downloading the website's content.  An online user cannot know if someone in Arizona might receive or view her posting to an online discussion group, an attachment to her or his email mailing list, or the link she uploaded to her website.  Consequently, individuals and businesses who transmit images on the Internet must comply with the Act or risk prosecution. Therefore, the Act interferes significantly with the interstate flow of information and with interstate commerce.

82.    The Act similarly burdens interstate commerce in the "brick and mortar" world.  Book publishers that sell and distribute their books nationwide, including in Arizona stores, do not vet their books for non-obscene images that could violate the Act. Thus, a book publisher which offers its full catalogue of books to bookstores and libraries in Arizona would subject itself to felony prosecution because many of its books are likely to contain non-obscene images that violate the Act.  The law thus unconstitutionally forces these publishers to choose between (1) not offering any books for sale to booksellers or libraries in Arizona, (2) undertaking the burdensome and virtually impossible task of vetting their catalogues for books which may violate the Act, and (3) risking felony prosecution in Arizona.

## COUNT I

### VIOLATION OF THE RIGHT TO FREEDOM OF SPEECH AND FREEDOM OF THE PRESS PROTECTED UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

83.    Plaintiffs repeat and re-allege the foregoing paragraphs.

84.    The First Amendment to the United States Constitution protects the rights of the people to "the freedom of speech" and "of the press."

85.    The guarantees of the First Amendment are secured to the people against unlawful acts of a state by the Fourteenth Amendment to the United States Constitution.

86.    The Act violates the First Amendment to the United States Constitution on its face because it discriminates on the basis of content, is not tailored to a compelling or important governmental purpose, and creates an overbroad restraint on protected speech.

87.    The Act also violates the First Amendment to the United States Constitution as applied to Plaintiffs because it criminalizes non-obscene speech, forcing Plaintiffs to choose between self-censorship of their protected speech and the risk of felony prosecution.

88.    The Act includes no intent or harm requirements, and therefore constitutes a strict liability or negligent crime for engaging in speech.

## COUNT II
### VIOLATION OF RIGHTS PROTECTED UNDER THE FIRST, FIFTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION— VAGUENESS AND LACK OF DUE PROCESS

89.     Plaintiffs repeat and re-allege the foregoing paragraphs.

90.     The guarantees of the First and Fifth Amendments are secured to the people against unlawful acts of a state by the Fourteenth Amendment to the United States Constitution.

91.     The Act is unconstitutionally vague and fails to provide due process, in violation of the First, Fifth, and Fourteenth Amendments.

## COUNT III
### VIOLATION OF THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

92.     Plaintiffs repeat and re-allege the foregoing paragraphs.

93.     The Act impedes commerce by Plaintiffs, their members, and their patrons and customers because it regulates commerce and communications that take place wholly outside of the State of Arizona.

94.     The Act violates the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.     Declare that the Act violates the First, Fifth, and Fourteenth Amendments and the Commerce Clause of the United States Constitution;

B.     Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them from enforcing the Act;

C.     Award Plaintiffs reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D.     Grant Plaintiffs such other and further relief as the Court deems just and proper.

1   Dated:    September 23, 2014

2   Respectfully submitted,

3                                                           /s/Daniel J. Pochoda

4   Joshua S. Akbar (Bar No. 025339)            Daniel J. Pochoda
5   Dentons US LLP                              (Bar No. 021979)
    2398 Camelback Road                         Victoria Lopez (Bar No. 330042)**
6   Phoenix, AZ 85016-9007                      ACLU Foundation of Arizona
    Telephone: (602) 508-3947                   3707 North 7th Street, Suite 235
7   Email: joshua.akbar@dentons.com             Phoenix, AZ 85011-0148
8                                               Telephone: (602) 650-1854
    Michael A. Bamberger (pro hac motion to be  Email: dpochoda@acluaz.org
9   filed)                                             vlopez@acluaz.org
    Richard M. Zuckerman (pro hac motion to be  **Admitted pursuant to Ariz. Sup. Ct.
10  filed)                                      R. 38(f)
11  Dentons US LLP
    1221 Avenue of the Americas                 Lee Rowland
12  New York, NY 10020                          (pro hac motion to be filed)
13  Telephone: (212) 768-6700                   ACLU Foundation
    Email: michael.bamberger@dentons.com        125 Broad Street, 18th Floor
14         richard.zuckerman@dentons.com        New York, NY 10004
15                                              Telephone: (212) 549-2500
                                                Email: lrowland@aclu.org
16

17
                            Attorneys for Plaintiffs
18

19

20

21

22

23

24

25

26

27

28