Daniel Pochoda (Bar No. 021979)
Victoria Lopez (Bar No. 330042)**
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85011-0148
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
          vlopez@acluaz.org

**Admitted pursuant to
    Ariz. Sup. Ct. R. 38(f)


Lee Rowland (admitted pro hac vice)
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Email: lrowland@aclu.org

Joshua S. Akbar (AZ State Bar No. 025339)
DENTONS US LLP
2398 E. Camelback Road, Suite 850
Phoenix, AZ 85016-9016
Telephone: (602) 508-3900
Facsimile:    (602) 508-3914
Email:    *joshua.akbar@dentons.com*


Michael A. Bamberger
(admitted pro hac vice)
Richard M. Zuckerman
(admitted pro hac vice)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Email: michael.bamberger@dentons.com
          richard.zuckerman@dentons.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ANTIGONE BOOKS L.L.C.; et al.<br>Plaintiffs,<br><br>-v-<br><br>TOM HORNE, in his capacity as Attorney General of the State of Arizona; et al.<br>Defendants. | **Civil Case No.<br>2:14-cv-02100-PHX-SRB**<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM AND DECLARATIONS IN SUPPORT**<br><br>***ORAL ARGUMENT REQUESTED*** |

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................................. ii

Motion for Preliminary Injunction ......................................................................................... 1

Memorandum of Law ............................................................................................................ 1

Introduction ........................................................................................................................... 1

Statement of Facts ................................................................................................................. 3

1.   The Plaintiffs ................................................................................................................. 3

2.   The Act .......................................................................................................................... 6

3.   The Impact of the Act .................................................................................................... 7

Legal Argument ..................................................................................................................... 11

   **A.**   Standards Governing the Issuance of a Preliminary Injunction ........................................ 11

   **B.**   Plaintiffs Are Likely to Prevail on Their First Amendment Claims ................................. 12

      **1.**   **The Act is a Content-Based Regulation of Speech that  is Not Tailored to the State's Interest in Protecting Privacy** ........................................................................ 12

      **2.**   **The Legislature Could Have Protected Privacy Without Directly Burdening Protected Speech** ................................................................................................. 16

      **3.**   **Vagueness Exacerbates the Act's First Amendment Harms** ................................. 17

   **C.**   Plaintiffs are Likely to Prevail on Their Commerce Clause Claims ................................. 19

   **D.**   Plaintiffs Face Irreparable Injury and the Public Interest Favors Injunction .................... 22

Conclusion ............................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Goddard,*
  Civ.00-505 TUC ACM, 2004 WL 3770439 (D. Ariz. Apr. 23, 2004) ............................ *passim*

*ACLU v. Johnson,*
  *194 F.3d 1149 (10th Cir. 1999) (same conclusion with respect to New Mexico*
  *statute)* ................................................................................................................................22

*Am. Libraries Ass'n. v. Pataki,*
  969 F. Supp. 160 (S.D.N.Y. 1997) .....................................................................................20, 21

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ............................................................................................................12, 16

*Associated Press v. Otter,*
  682 F.3d 821 (9th Cir. 2012) ....................................................................................................22

*Clear Channel Outdoor, Inc. v. City of L.A.,*
  340 F.3d 810 (9th Cir. 2003) ....................................................................................................11

*Edgar v. Mite Corp.,*
  457 U.S. 624 (1982) ..................................................................................................................22

*Elrod v. Burns,*
  427 U.S. 347 (1976) ............................................................................................................11, 22

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975) ............................................................................................................12, 13

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ..................................................................................................................17

*Healy v. Beer Inst.,*
  491 U.S. 324 (1989) ..................................................................................................................20

*Jenkins v. Georgia,*
  418 U.S. 153 (1974) ..................................................................................................................12

*Johnson v. Cal. State Bd. of Accountancy,*
  72 F.3d 1427 (9th Cir. 1995)......................................................................................................11

*Keyishian v. Bd. of Regents,*
  385 U.S. 589 (1967) ..................................................................................................................17

*Klein v. City of San Clemente,*
  584 F.3d 1196 (9th Cir. 2009) ..................................................................................................22

*NAACP v. Button,*
  371 U.S. 415, 432-33 (1963) ....................................................................................................17

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ..................................................................................................................22

*PSINet, Inc. v. Chapman,*
  108 F. Supp. 2d. 611 (W.D. Va. 2000) ....................................................................................22

*PSINet, Inc. v. Chapman,*
  167 F. Supp. 2d 878 (W.D. Va. 2001) .....................................................................................22

*Regan v. Time, Inc.,*
  468 U. S. 641 (1984) ................................................................................................................12

*Rogers v. United States,*
  422 U.S. 35 (1975) (Marshall, J., concurring) ........................................................................14

ii

*Sammartano v. First Judicial Dist. Court,*
    303 F.3d 959, 974 (9th Cir. 2002)........................................................................22
*Time, Inc. v. Hill,*
    385 U.S. 374 (1967)..............................................................................................14
*Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n.,*
    512 U.S. 622 (1994)..............................................................................................16
*United States v. Playboy Enm't. Grp., Inc.,*
    529 U.S. 803 (2000)..................................................................................12, 13, 16
*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................................................. *passim*
*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)..............................................................................................17

**Constitution and Statutes**
Ariz. Rev. Stat. Ann. §§ 11-811(D)(14), (18) ...........................................................6
Ariz. Rev. Stat. Ann. § 13-1425(A) ...............................................................1, 6, 17
Ariz. Rev. Stat. Ann. § 13-1425(A) & (D) ......................................................18, 19
Ariz. Rev. Stat. Ann. § 13-1425(B) ........................................................................14
Ariz. Rev. Stat. Ann. § 13-1425(B)(3).....................................................................19
Ariz. Rev. Stat. Ann. §§ 13-1425(C) .........................................................................6
Ariz. Rev. Stat. Ann. § 13-1425(D) ......................................................................3, 4
Ariz. Rev. Stat. § 13-1425.........................................................................................1
U.S. Const. amend IV ................................................................................... *passim*
U.S. Const. amend I ...................................................................................... *passim*
U.S. Const. art 1, § 8, cl. 3 ........................................................................... *passim*

**Other Authorities**
Ct. R. 38(f) ..............................................................................................................23
Fed. R. Civ. P. 65 ......................................................................................................1
Fed. R. Civ. Proc. 5(b)(2)(E)...................................................................................24
51st Leg., 2d Reg. Sess. (Ariz. 2014).........................................................................1

**Motion for Preliminary Injunction**

Pursuant to Fed. R. Civ. P. 65, Plaintiffs respectfully file this Motion for a Preliminary Injunction enjoining enforcement of Ariz. Rev. Stat. § 13-1425, as amended by H.B. 2515, 51st Leg., 2d Reg. Sess. (Ariz. 2014) ("H.B. 2515" or the "Act"), pending the final determination of this action. Grounds for this Motion, as set forth in the Memorandum below, are that Plaintiffs are likely to succeed on their claim that the Act violates the First Amendment, the Due Process Clause, and the Commerce Clause; Plaintiffs, their members, officers, employees, customers, patrons, and readers will be irreparably harmed by the Act; and the public interest favors the issuance of an injunction. This Motion is based on the pleadings, the Memorandum, the accompanying Declarations by Plaintiffs, oral argument should the Court grant Plaintiffs' request therefor, and such other evidence that the Court should hear in this case.

**Memorandum of Law**

**Introduction**

Arizona has enacted an overbroad, content-based law that criminalizes the display, publication, and sale of non-obscene images fully protected by the First Amendment. The law, with limited, vague exceptions, makes it a felony punishable by nearly four years in prison to disclose images of nudity or sexual activity when a person "knows or should have known" that the person depicted did not consent to "the disclosure." Ariz. Rev. Stat. Ann. § 13-1425(A).

This is a criminal statute of "alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). A defendant can be convicted even if there was neither ill intent nor harm done. For an image to be restricted, a person pictured need not have any expectation of privacy—nor even be identifiable. The Act applies fully to artistic, historical, and newsworthy images, both in print and online. As a result, it criminalizes speech that lies at the very core of the First Amendment's protections. The law makes no distinction between a hacker who releases private nudes and a publisher who prints images of torture

1

at Abu Ghraib prison. The Act sweeps in not just malicious invaders of privacy, but also countless Internet users who innocently repost online images.

The law's impact on Plaintiffs—booksellers, book and newspaper publishers, librarians, photographers, and videographers—is concrete and severe. Swept within the law are books of great artistic, cultural, political, and historical value such as *The Bodies of Mothers: A Beautiful Body Project* and *Abu Ghraib: The Politics of Torture*.[1] H.B. 2515 criminalizes the display of Nick Ut's iconic Pulitzer Prize-winning photograph of a naked Vietnamese girl fleeing a village bombed by napalm, and photographs of unclothed prisoners at the historic Attica prison riot. The Act threatens a felony conviction for those who reprint the works of the greatest American photographers, including Imogen Cunningham, Robert Mapplethorpe, and Edward Weston. And it criminalizes those who share newsworthy images of art exhibits, breastfeeding, public figures caught in compromising situations, and more.

The central element of the offense—that the person "knows or should have known" that the individual depicted did not consent to "the disclosure"—is at the core of the problem. Publishers, booksellers, and librarians know that the Abu Ghraib prisoners, Attica inmates, and child victim of war did not consent to being photographed or to the publication of their images. A photographer who takes an image of an unclothed person in a war or conflict zone cannot possibly be expected to obtain the person's consent. Subjects of Edward Weston's photographs, some of whom passed away long ago, are not available to consent to new publications. In most if not all instances, it is impossible for booksellers to ascertain whether persons depicted in books have consented to the taking or the publication of the image. And if "the disclosure" means what it implies—*e.g.*, the specific offer of a book at a particular bookstore or library—then the Act's reach is even more startling.

---

[1] Jade Beall, *The Bodies of Mothers: A Beautiful Body Project* (2014); Mark Danner et al, *Abu Ghraib: The Politics of Torture* (2004).

Although promoted as a law to combat "revenge porn"—the malicious posting by an ex-partner of a private image, taken during a personal relationship and posted after the break-up to harass the former partner—H.B. 2515 is not limited to malicious invasions of privacy. Neither "revenge" nor "porn" is an element of the offense. The distinction is of constitutional moment: Displaying a non-obscene image of nudity or sexual conduct without the consent of a person pictured is simply not equivalent to a malicious invasion of privacy. Such a generalization does violence to First Amendment principles. H.B. 2515 is overbroad and content-based, criminalizes and chills valuable speech within the core of the First Amendment's protections, and must be enjoined.

## Statement of Facts

### 1.      The Plaintiffs

Plaintiffs are booksellers, publishers, librarians, and photographers (or associations acting on their behalf) who create, publish, display, and offer media fully protected by the First Amendment. A substantial amount of this media contains non-obscene images of "nudity" and "specific sexual activities" as defined in the Act. Ariz. Rev. Stat. Ann. § 13-1425(D).  Accompanying this Memorandum are Declarations of officers or employees of each of the Plaintiffs, to which we respectfully refer the Court. *See* List of Plaintiff Declarations, attached as Appendix A to this Memorandum. Those Declarations set forth in detail who the Plaintiffs are, their First Amendment-protected activity which the Act criminalizes, and the threat of irreparable injury that the Act causes, which forces the Plaintiffs to choose between risking felony prosecution and engaging in self-censorship.

**Booksellers.** Plaintiffs Antigone Books, Bookmans, Changing Hands, Copper News Bookstore, and Mostly Books, are booksellers that maintain physical stores located within Arizona and sell books on the Internet to a national clientele, including in Arizona. Antigone Books Decl. ¶¶ 4, 6; Bookmans Decl. ¶¶ 4, 8; Changing Hands Decl. ¶¶ 4, 6; Copper News Decl. ¶¶ 4, 7; Mostly Books Decl. ¶¶ 4, 6.  Plaintiff American Booksellers Foundation for Free Expression ("ABFFE") is an association of booksellers across the

nation. ABFFE Decl. ¶ 5. Plaintiff booksellers and members of Plaintiff ABFFE carry media restricted by the broad language of the Act in their stores and advertise media restricted by the Act on their websites. *Id.* ¶ 10; Antigone Books Decl. ¶ 8; Bookmans Decl. ¶¶ 8, 23; Changing Hands Decl. ¶ 8; Copper News Decl. ¶ 15; Mostly Books Decl. ¶ 8. For example, Plaintiffs offer books that include nonconsensual nudity (such as *Moments: the Pulitzer-Prize Winning Photographs*; *Remembering to Forget: Holocaust Memory Through the Camera's Eye*; and *Abu Ghraib: the Politics of Torture*).[2] Antigone Books Decl. ¶ 18; Bookmans Decl. ¶¶ 19, 20; Changing Hands Decl. ¶ 15; Mostly Books Decl. ¶ 23. Plaintiffs also offer numerous photography books where the consent of nude subjects is unknown or unobtainable, such as *Edward Weston's Book of Nudes* and *Joyce Tenneson: A Life in Photography.*[3] ABFFE Decl. ¶ 16; Changing Hands Decl. ¶¶ 13-14; Mostly Books Decl. ¶¶ 18-20.

**Book Publishers.** The members of Association of American Publishers ("AAP") include most of the major book publishers in the United States, as well as smaller and non-profit publishers, university presses, and scholarly associations. AAP Decl. ¶ 3. Their books include a broad range of mainstream, non-obscene publications which contain images restricted by the Act, including (a) biology texts, which contain images of the naked body (or portions thereof); (b) health and sex education books including, for example, images of breastfeeding; (c) histories and public affairs books, including images taken at crime scenes, at disaster scenes, and in conflict and war zones; (d) photography books with artistic nude images; and (e) books about celebrities which include images of women in swimwear or low-cut gowns that reveal a portion of the breast below the areola (even though the areola is fully covered). *Id.* ¶ 11. For many of these images, publishers

---

[2] Hal Buell, *Moments: The Pulitzer Prize-Winning Photographs* (2007); Barbie Zelizer, *Remembering to Forget: Holocaust Memory Through the Camera's Eye* (2000).

[3] Nancy Newhall & Edward Weston, *Edward Weston's Book of Nudes* (2007).

4

either know they lack subjects' consent, or cannot ascertain whether there was consent; each image is constitutionally protected. *Id.* ¶¶ 14-15, 20.

**Newspaper Publishers**. Plaintiff Voice Media Group, Inc. ("VMG") publishes *Phoenix New Times* and ten other alternative newsweeklies, and maintains their websites. VMG Decl. ¶¶ 4, 6, 10. *Phoenix New Times*' print edition and website regularly include images of persons nude or engaged in sexual activities, as defined in the Act. *Id.* ¶ 8. These include images that show parts of the lower female breast or clothed genitalia, such as artistic photographs in local exhibitions, photographs of people at guest-restricted events, and compromising images of public figures. *Id.* ¶¶ 16, 20. VMG does not obtain the individual consent of the persons pictured; the images are newsworthy and protected by the First Amendment. *Id.* ¶¶ 11, 18.

**Librarians.** Plaintiff Freedom to Read Foundation ("FTRF") is a nationwide association of libraries and librarians. FTRF Decl. ¶ 3. Libraries in Arizona include in their collections books and other media containing images of nudity or sexual activities restricted by the Act, including the full range of books published by AAP members. *Id.* ¶ 7. Libraries in Arizona also provide Internet access to their patrons and, even if such access is filtered, thereby offer and display non-obscene images of nudity and sexual activities. *Id.* ¶¶ 6, 11. The Arizona library patrons who access such images and thus display them—and share them with friends—are also subject to felony prosecution under the Act. Libraries outside of Arizona offer books containing restricted images when they loan books to Arizona libraries through Interlibrary Loan programs. *Id.* ¶ 13.

**Photographers and Videographers.** The members of Plaintiff National Press Photographers' Association ("NPPA") take photographs at crime scenes, at disaster scenes, in prisons, and in war zones where persons may be in a state of nudity involuntarily. NPPA Decl. ¶ 10. Nick Ut, an NPPA member photographer, took the iconic image of a Vietnamese girl fleeing napalm. *Id.* ¶ 14; Exhibit A. NPPA member Mickey Osterreicher was present at the inmate uprising at Attica prison in western New York; among the searing images from that uprising were photographs of inmates standing in the

prison yard, stripped naked. *Id.* ¶ 12; Exhibit B. The Act makes sharing such vital historical images a felony. *Id.* ¶ 13.

### 2. The Act

H.B. 2515 created a new crime, entitled the "unlawful distribution of images":

> It is unlawful to intentionally disclose, display, distribute, publish, advertise or offer a photograph, videotape, film or digital recording of another person in a state of nudity or engaged in specific sexual activities if the person knows or should have known that the depicted person has not consented to the disclosure.

Ariz. Rev. Stat. Ann. § 13-1425(A). The Act has specified exceptions for disclosures made pursuant to law enforcement practices, in legal proceedings, or "[i]mages involving voluntary exposure in a public or commercial setting." *Id.* § 13-1425(B). It also exempts certain online providers from liability for the postings of users. *Id*. The Act incorporates the following definitions from Arizona's county zoning code:

> "[S]tate of nudity" means any of the following:
> (a) The appearance of a human anus, genitals or a female breast below a point immediately above the top of the areola.
> (b) A state of dress that fails to opaquely cover a human anus, genitals or a female breast below a point immediately above the top of the areola. . . . .

> "Specific sexual activities" means any of the following:
> (a) Human genitals in a state of sexual stimulation or arousal.
> (b) Sex acts, normal or perverted, actual or simulated, including acts of human masturbation, sexual intercourse, oral copulation or sodomy.
> (c) Fondling or other erotic touching of the human genitals, pubic region, buttocks, anus or female breast.
> (d) Excretory functions as part of or in connection with any of the activities under subdivision (a), (b) or (c) of this paragraph.

Ariz. Rev. Stat. Ann. §§ 11-811(D)(14), (18); 13-1425(D). If the person depicted is not identifiable, a violation of H.B. 2515 is a class 5 felony, with a sentence for a first conviction of six to thirty months imprisonment. Ariz. Rev. Stat. Ann. §§ 13-1425(C); 13-702(D). If the person depicted is "recognizable," the conduct qualifies as a class 4 felony, which carries a prison sentence of one year to three years and nine months. Ariz. Rev. Stat. Ann. § 13-1425(C).

### 3. The Impact of the Act

The Act criminalizes a wide range of non-obscene images, including images of great artistic, historic, and political value.

**Artistic Images Restricted By the Act.** Plaintiffs collectively publish and offer books and newspapers that contain images of persons in a state of nudity. Plaintiffs generally do not know whether the persons depicted have consented to the publication. AAP Decl. ¶ 15; ABFFE Decl. ¶ 8; VMG Decl. ¶ 18. Plaintiffs *know* that the persons depicted have not consented to "the disclosure" by an individual Plaintiff—*e.g.*, the specific offering of a book by a specific bookstore. AAP Decl. ¶ 14; Antigone Books Decl. ¶ 14; FTRF ¶ 10; VMG Decl. ¶ 13. Plaintiffs generally do not know whether the images were taken in a "public or commercial setting." AAP Decl. ¶ 19; Bookmans Decl. ¶ 14. Among the many books published or offered for sale by Plaintiffs that contain restricted images are books with photography by Edward Weston (whose archives are housed at Arizona's Center for Creative Photography),[4] Imogen Cunningham,[5] and Robert Mapplethorpe.[6] ABFFE Decl. ¶ 16; Antigone Books Decl. ¶ 15; Changing Hands Decl. ¶ 13; Mostly Books Decl. ¶ 18. The Act also applies to images in publications such as *The Bodies of Mothers: A Beautiful Body Project* by Tucson photographer Jade Beall who specializes in therapeutic photography for women. Antigone Decl. ¶ 14.

---

[4] *See*, *e.g.*, Manfred Heiting & Terence Pitts, *Edward Weston* (2013); *Edward Weston: 125 Photographs* (Steve Crist ed., 2011); Laura Gonzales Flores, *Edward Weston & Harry Callahan: He, She, It* (2013); *Edward Weston* (Filippo Maggia ed., 2013); Edward Weston, *Edward Weston: Nudes* (1993); and Susan Morgan & Cole Weston, *Edward Weston: Portraits* (2005). Changing Hands Decl. ¶ 13; Mostly Books Decl. ¶ 18.

[5] *See*, *e.g.*, Mary Street Alinder, *Group f.64: Edward Weston, Ansel Adams, Imogen Cunningham, and the Community of Artists Who Revolutionized American Photography* (Bloomsbury USA 2014); Jamie Allen et al., *Imogen Cunningham* (2013); Richard Lorenz, *Imogen Cunningham: Ideas without End* (1993). Mostly Books Decl. ¶ 18.

[6] *See*, *e.g.*, Robert Mapplethorpe, *Lady: Lisa Lyon* (1996); Robert Mapplethorpe, *Perfection in Form* (2009); Sylvia Wolf, *Robert Mapplethorpe: Polaroids* (2013); Robert Mapplethorpe, *Mapplethorpe* (2007); and Robert Mapplethorpe, *Robert Mapplethorpe: The Black Book* (2010). Antigone Decl. ¶ 15.

7

Booksellers both "offer" books with these nude artistic images to persons in Arizona, and "display" such images to persons who use their websites. For example, the website of Tattered Cover, a bookseller member of Plaintiff ABFFE, displays an image of the cover of *Edward Weston: Portraits,* which includes a nude woman. ABFFE Decl. ¶ 16. Plaintiff bookstores in Arizona also offer this book for sale. Changing Hands Decl. ¶ 13; Mostly Books Decl. ¶ 18. *Phoenix New Times* reports on art exhibitions, including Professor Betsy Schneider's exhibit containing nude photographs of her own children, and offers these images in print and displays them online. VMG Decl. ¶ 26.

**Newsworthy, Political, and Historic Images Restricted By the Act.** In addition to artistic nudity, Plaintiffs offer media containing images of great historic and political value. Plaintiffs *know* that those depicted in these images did not consent either to the taking or display of the image. AAP Decl. ¶ 14; Changing Hands Decl. ¶ 12; FTRF Decl. ¶ 10; NPPA Decl. ¶ 11; Bookmans Decl. ¶ 18; VMG Decl. ¶ 13. Among these images is the 1972 Pulitzer Prize-winning "Napalm Girl" photograph. Bookmans Decl. ¶ 19; Changing Hands Decl. ¶ 15; Mostly Books Decl. ¶ 23. That nine-year-old girl, who appears frontally naked, did not consent to taking of the photograph; nor was she voluntarily undressed. Bookmans Decl. ¶ 19. Plaintiffs also offer books containing photographs of nude Abu Ghraib prisoners. Antigone Books Decl. ¶ 18; Bookmans Decl. ¶ 20; Changing Hands Decl. ¶ 15.[7] An online preview of *Abu Ghraib: The Politics of Torture*, available on the website application used by Antigone Books, shows a fully nude prisoner cowering before a barking dog. Antigone Decl. ¶ 18; Exhibit C.

The Act also threatens to silence newsworthy speech about current events and public figures. *Phoenix New Times* regularly publishes photographs of local events that revolve around sexuality, such as the annual "Fetish Ball," a restricted event where attendees (who are not nude) engage in sexual role-play; and images from the popular

---

[7] *See*, *e.g.*, Steven Strasser & Craig R. Whitney, *The Abu Ghraib Investigations: The Official Independent Panel and Pentagon Reports on the Shocking Prisoner Abuse in Iraq* (2004). Antigone Decl. ¶ 18.

Adult Video News awards, where scantily-clad attendees display parts of their breasts below the top of the areola. VMG Decl. ¶¶ 16, 16 n.2, 17. *Phoenix New Times* does not secure consent before taking or posting such images. *Id.* ¶ 21. Plaintiff VMG's newspapers have also printed images of Congressman Anthony Weiner's erect but clothed genitalia. *Id.* ¶ 20.

"**Knows or Should Have Known.**" Plaintiffs do not know what the Act means when it states they may not publish a nude photograph if they "know[] or should have known" that the person depicted did not consent. Mostly Books ¶ 12; Copper News Decl. ¶¶ 17-18; VMG Decl. ¶ 13. For all of the above publications, Plaintiffs know that the works are non-obscene and constitutionally valuable. But they do not know the stories behind most of the images: whether they were taken with consent, originally shared with consent, or subsequently published with consent. AAP Decl. ¶ 15; ABFFE Decl. ¶ 8; Antigone Books ¶ 12; VMG Decl. ¶ 18; Bookmans Decl. ¶ 13. The law appears to impose a duty on Plaintiffs to investigate or understand the circumstances behind each picture they publish, which is an unfeasible task. Antigone Books Decl. ¶ 13; Bookmans Decl. ¶ 17. In many instances, Plaintiffs have no practicable way to ascertain whether there was consent, or to obtain consent. FTRF Decl. ¶ 10. It is impossible to do so when the depicted person cannot be identified, or is deceased or unreachable. Antigone Books Decl. ¶ 12. Plaintiff publishers sometimes rely on the assumption that the photographer obtained consent (and booksellers rely on the assumption that the publisher or photographer did so) or that no consent was necessary. AAP ¶ 16; VMG Decl. ¶ 13. The Act criminalizes any good faith error in such an assumption.

The "**Disclosure.**" Plaintiffs also do not understand the meaning of "disclosure." Bookmans Decl. ¶ 15; VMG Decl. ¶ 13. The undefined term could mean the publication of a nude image or its display or sale. Antigone Books Decl. ¶ 12; FTRF Decl. ¶ 10. It is unclear whether consent to any disclosure is sufficient, or whether the consent must apply to each specific disclosure—the publication of a restricted image in a particular book or

newspaper, or the offer of a particular book for sale in a particular bookstore. Antigone Books Decl. ¶ 12; VMG Decl. ¶ 13.

**"Voluntary Exposure in a Public or Commercial Setting."** The Act exempts images that involve voluntary exposure in a "public" or "commercial" setting, but these terms are vague. AAP Decl. ¶ 18; Copper News Decl. ¶¶ 17-18; NPPA Decl. ¶ 19. It is unclear whether, for example, a beach open only to hotel guests or a dance performance restricted to ticket holders is a "public setting." NPPA Decl. ¶ 19; AAP Decl. ¶ 19. For many images, publishers have no way of ascertaining whether the image was taken in a public setting, even if they understand the parameters of the term. AAP Decl. ¶ 20; Bookmans Decl. ¶ 14. For instance, a newspaper editor might not know whether a photograph of a celebrity in a gown that exposed the sides of her breasts was taken at a televised awards ceremony or at a private after-party. AAP Decl. ¶ 20. The Act also does not define "commercial," which Plaintiffs have guessed could mean that the person depicted was compensated, or that the photographer was considering selling the image. AAP Decl. ¶ 19. Plaintiff Copper News Book Store sells the book *The New Sensual Massage*.[8] Copper News Decl. ¶ 13. Copper News does not know whether or not the persons depicted were photographed in a commercial setting. *Id.* ¶ 19.

In sum, all Plaintiffs *can* be sure of is that they regularly lack consent, and that they have a First Amendment right to display, offer, and sell these images.

**Fear of Prosecution Under the Act**. Plaintiffs share a reasonable fear of being prosecuted under this Act for their First Amendment protected activities. *Id.* ¶ 9; AAP Decl. ¶ 5; ABFFE Decl. ¶ 11; Antigone Books Decl. ¶ 9; Bookmans Decl. ¶ 11; Changing Hands Decl. ¶ 9; FTRF Decl. ¶ 8; Mostly Books Decl. ¶ 10; NPPA Decl. ¶ 8; VMG Decl. ¶ 12.

---

[8] Gordon Inkeles, *The New Sensual Massage* (1992).

Plaintiffs also understand that Arizona has a history of enforcing the law against protected speech. In 2007, law enforcement officers falsely arrested the two co-founders of the *Phoenix New Times* for printing information about illegal subpoenas seeking information on stories critical of Maricopa County Sheriff Joe Arpaio. VMG Decl. ¶ 25. In 2008, VMG published images taken by artist and Arizona State University Professor Betsy Schneider of her young children, and included images from her show on its website. *Id.* ¶ 26. Maricopa County began a criminal investigation into the *Phoenix New Times*' publications of these images, accompanied by a public press conference in which prosecutors indicated that any reader who picked up a copy of the weekly could be prosecuted. *Id.*

**Legal Argument**

**A.     Standards Governing the Issuance of a Preliminary Injunction**

A preliminary injunction should be granted where a plaintiff "demonstrates…a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) (emphasis in original; citation omitted). "Thus, the greater the relative hardship to [plaintiffs,] the less probability of success must be shown." *Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003) (citation omitted). Here, Plaintiffs face a chilling choice between risking felony criminal prosecution and self-censoring their display, use, and sale of artistic, historical, and newsworthy images. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs are entitled to a preliminary injunction because they demonstrate probable success on the merits and irreparable injury, and because both the balance of harms and the public interest weigh strongly in favor of enjoining the Act.

### B. Plaintiffs Are Likely to Prevail on Their First Amendment Claims

#### 1. The Act is a Content-Based Regulation of Speech that is Not Tailored to the State's Interest in Protecting Privacy

The Act is unconstitutional as a content-based regulation of protected non-obscene speech that is not narrowly tailored to its stated purpose—redressing malicious, harmful invasions of privacy. *See Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004); *United States v. Playboy Enm't. Grp., Inc.*, 529 U.S. 803, 813-16 (2000).

It cannot be disputed that the speech at issue—non-obscene images of nudity and sexual activity—is fully protected by the First Amendment. *Playboy*, 529 U.S. at 811; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975); *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974) ("[N]udity alone is not enough to make material legally obscene"). Nor can it be disputed that the Act seeks to regulate this non-obscene speech solely based on its content—images of nudity or specified sexual activity, under the expansive definitions in the Act. *Stevens*, 559 U.S. at 468 (statute restricting images and audio "depending on whether they depict [specified] conduct" is content-based); *Playboy*, 529 U.S. at 811 ("The speech in question is defined by its content; and the statute which seeks to restrict it is content based.").

"Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft*, 542 U.S. at 660. Such prohibitions and regulations "cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U. S. 641, 648-49 (1984) (citations omitted).

As a content-based prohibition of protected, non-obscene speech, the Act is "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *Stevens*, 559 U.S. at 468 (quoting *Playboy*, 529 U.S. at 817). The Act "can stand only if it satisfies strict scrutiny." *Playboy*, 529 U.S. at 813 (citing *Sable Commc'ns, Inc. v. Fed. Commc'ns.*, 492 U.S. 115, 126 (1989)). Under strict scrutiny, the prohibition or regulation "must be narrowly tailored to promote a compelling Government

interest" which cannot be served through a "less restrictive alternative." *Playboy*, 529 U.S. at 813. "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Id.*

Here, the State cannot rebut the presumption of unconstitutionality because the Act makes no attempt to safeguard constitutionally-protected speech and is not tailored to redressing malicious, harmful invasions of privacy. The Act reaches far more than the bad actor. It makes no distinction between images that are published with malice or wrongful intent and those that are not. Nor does it make any distinction between images in which the persons pictured have an expectation of privacy and those in which they do not. The Act makes no distinction between a disclosure that causes harm and one that does not; it does not require that the person depicted even be identifiable. It defines nudity and sexual activities so expansively that it includes, *e.g.*, fully-clothed horseplay and the side of the female breast. The Act has no exception for images related to matters of public concern, including the kind of historical, artistic, and newsworthy content Plaintiffs offer, display, and sell. *Erznoznik*, 422 U.S. at 213 (ordinance was unconstitutional because it "sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach.").

Without specific intent, harm, and privacy language to narrow the Act's reach, providers of constitutionally-protected speech are at risk.

Plaintiffs, who provide the public with information, art, and news, should not have to worry about encountering felony charges for doing their jobs. Yet, under the Act, they all must. None of them secures individualized consent from each depicted person, as the Act requires. Nor do they investigate the circumstances behind each photograph they print; to do so would be a crippling use of resources. In fact, given the incredible breadth of the Act's expansive definitions of nudity and sexual activities, it is difficult for

Plaintiffs to know the full extent of the Act's impact on their inventories. The Act's only exception applicable to Plaintiffs is the provision for images taken voluntarily "in a public or commercial setting." Ariz. Rev. Stat. Ann. § 13-1425(B).  These terms are undefined, difficult to understand, and impossible to apply.

Furthermore, the sharing and display of non-obscene adult photographs on the Internet is a popular activity, to put it mildly. The Act equally criminalizes a malicious, initial invader of privacy (such as a hacker and leaker of private photos) *and* subsequent Internet users (including patrons of Arizona libraries) who share restricted images. Both can be felons under the Act. Yet, the second actor has simply shared a non-obscene image she lawfully obtained online. This downstream sharer may intend no harm and has no knowledge that (or if) the person depicted has objected to subsequent display of the image. It is beyond dispute that such sharing occurs with incredible frequency online, and the Act therefore subjects innumerable Arizona residents who share or view images to felony penalties.

In addition, the Act's reach is vastly expanded by its criminalization of the disclosure of restricted images where the individual "should have known" she lacked the consent of a depicted person. *Id.* § 13-1425(A). This is a negligence standard. The First Amendment prohibits the use of negligence-based standards in regulating speech. *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("A negligence test would place on the press the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it… ."); *Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring) ("[W]e should be particularly wary of adopting such a standard for a statute that regulates pure speech.").

Thus, the Act cannot meet strict scrutiny, or even rational basis review:

- The Act imposes criminal liability absent harm or an intent to harm.
- The Act imposes criminal liability even if the person depicted in restricted images had no expectation of privacy and was not recognizable.

- The Act contains no exceptions for valuable or newsworthy speech.
- The Act imposes criminal liability upon negligent speech.

As their Declarations attest, and as detailed above, the result is that the Act chills and criminalizes the display of constitutionally protected images offered by Plaintiffs and others. That the Act reaches these works is dispositive of its unconstitutionality.

The Legislature failed to tailor the law to malicious and harmful invasions of privacy. H.B. 2515 was promoted as a "revenge porn" bill by its sponsors and supporters. But the phrase is extremely misleading as applied to the Act, given that it requires no mal intent whatsoever (let alone revenge), it reaches far more than private sexual activity, and it criminalizes non-obscene images that cannot be considered pornographic. Revenge porn is a modern scourge typified by those who, motivated by revenge, knowingly post intimate digital images of former partners (usually women) with the intent and effect of harassing them, ruining reputations and employment prospects. The harms of revenge porn are undoubtedly real, and raise difficult and important questions about digital privacy and women's rights to bodily autonomy and full enjoyment of the Internet.

But H.B. 2515 is *not* a revenge porn law. It simply, and unconstitutionally, places a prior consent requirement on the sharing of any nude or sexual image. And in doing so, it sweeps within its reach materials of inarguably artistic, historical, and newsworthy value. When legislatures criminalize speech, loaded phrases such as "revenge porn" and "animal cruelty" cannot justify a law whose text does not reflect the intentional and harmful conduct claimed as motivation for the restriction. *Stevens*, 559 U.S. at 474 ("We read § 48 to create a criminal prohibition of alarming breadth. To begin with, the text of the statute's ban on a 'depiction of animal cruelty' nowhere requires that the depicted conduct be cruel."). In short, criminalizing speech is an area of legislation that demands precision. The Legislature used no such precision in drafting H.B. 2515.

Nor can the Act be defended based on a supposition that Defendants would not bring prosecutions for the newsworthy, artistic, and historic images described in

Plaintiffs' declarations. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige.* We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480.

## 2. The Legislature Could Have Protected Privacy Without Directly Burdening Protected Speech

If the Legislature's intent was to protect individuals from "revenge porn"—malicious invasions of their privacy—it utterly failed to do so in a manner calculated to minimize the harms to lawful speech protected by the First Amendment. Because less restrictive, alternative means are available to address revenge porn, the Act cannot survive strict scrutiny. *Playboy*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); *Ashcroft*, 542 U.S. at 665 (affirming preliminary injunction against Child Online Protection Act because, among other reasons, the government had not carried burden of showing that the proposed alternatives would be less effective). The Act also fails strict scrutiny because the State cannot show—as it must—that the Act "will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys.*, *Inc. v. Fed. Commc'ns Comm'n.*, 512 U.S. 622, 664 (1994).

Here, the Legislature relied on testimony about women victimized online by malicious ex-partners, who experienced extreme trauma and could not get their intimate images taken down off the web. Yet, none of these hallmarks are reflected in the law. The Legislature made no attempt to tailor the criminal statute to revenge porn by including, as elements of the offense: (1) malice and (2) intent to harm that (3) causes actual harm, due to disclosure of an image (4) taken in an intimate relationship, (5) in violation of an expectation of privacy. Including these as elements of the offense would not only line the crime up closer to its stated legislative purpose, but in so doing would dramatically reduce the risk that the Act would chill Plaintiffs' protected speech. Furthermore, the legislative history shows that the Legislature did not even explore the possibility of a civil statute directly addressing the issue—malicious exposure of photographs taken in an intimate

16

relationship with an expectation of privacy—with remedies addressed to the harm, such as a takedown order for images maliciously posted by a former intimate.

The terms of the Act underscore the absence of tailoring. For example, not only does the Act require no harm, but much worse, the Act explicitly includes images of unrecognizable persons, where actual harm to privacy rights is well-nigh impossible.

### 3. Vagueness Exacerbates the Act's First Amendment Harms

The Act's constitutional infirmities are exacerbated by its vagueness, which violates the Due Process Clause. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The requirement of clarity is especially stringent when a law interferes with First Amendment rights. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 432-33 (1963)) ("'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'").

Many terms in H.B. 2515 are inscrutable. The Act uses a series of verbs to define conduct that may constitute the offence of "disclosure." Yet, this list of abstract verbs— "disclose, display, distribute, publish, advertise, or offer"—only expands the possible meanings of "disclosure," and often beyond all common understanding. Ariz. Rev. Stat. Ann. § 13-1425(A). *See ACLU v. Goddard*, Civ.00-505 TUC ACM, 2004 WL 3770439, at *2 (D. Ariz. Apr. 23, 2004) (finding law unconstitutionally vague where "it fails to distinguish between 'transmit' or 'send' and the exempted act of 'posting.'"). Plaintiffs reasonably fear that "linking" to a webpage amounts to unlawfully "advertis[ing]" restricted content found on that site, VMG Decl. ¶ 15, or that offering to sell Edward Weston photography books constitutes an "offer" of all of the images inside, thereby subjecting each image to the Act's consent requirements, or its penalties, Changing Hands

Decl. ¶ 13. Given that Plaintiffs are not entirely clear on whether conduct such as linking to an image or offering a book for sale is a "display" of its images—and the wrong end of that assessment brings felony consequences—they have to assume that it is. Copper News Decl. ¶¶ 16-21.

Further, for each "disclosure" (however defined), the law imposes a prior-consent requirement but fails to explain how "consent" may be achieved. Thus, booksellers have no way of knowing, for example, if they may presume that a subject consents to re-sale of his images contained in a book, or if the booksellers themselves must secure the subject's actual consent. Antigone Books Decl. ¶ 12. Nor is it clear if the booksellers must secure consent for the book, or instead, for "every specific display, advertisement, or sale"—for each medium in which the book is advertised, and for every customer to whom it is offered. Bookmans Decl. ¶ 15. Even if consent may be presumed in certain situations or contexts, the law gives no clue as to when, how, or by whom. Rather, "[t]he law appears to impose a duty . . . to investigate or understand the circumstances of consent behind each picture," even though "[i]t is simply impossible for our employees to understand whether a depicted person has consented to our use . . . solely on looking at the image itself." Antigone Books Decl. ¶¶ 12–13. These questions are complicated by the Act's lack of time or age requirements; it is unclear whether a minor could ever "consent" to an image being shown; if not, images such as "Napalm Girl" would be flatly illegal. Similarly, it is unclear whether showing an image of a naked corpse is *ever* permissible; yet that interpretation permanently bars the display of Holocaust atrocities that include images of naked, tortured Jews. Nor is it clear whether one must (and if so how one could) secure the consent of a person who passed away after the image was taken but before the "disclosure." ABFFE Decl. ¶ 8.

Just as the law criminalizes without defining "disclosure," it fails to define precisely what it is that cannot be disclosed. For example, the forbidden "[s]tate of nudity" includes "[a] state of dress that fails to opaquely cover a human anus, genitals or a female breast breast." Ariz. Rev. Stat. Ann. § 13-1425(A) & (D) (incorporating the definitions

contained in §11-811(D)). "Specific sexual activities" includes "[s]ex acts, normal or perverted, actual or simulated," and "[f]ondling or other erotic touching" of body parts, clothed or unclothed. *Id*. Plaintiffs find these definitions vague and in conflict with commonsense understandings of "nudity" and "sex." *See* VMG Decl. ¶ 17 ("[S]imulated sex acts" would appear to include "fully-clothed dirty dancing, groping, and other activities that most people would not consider private.").

In addition to these terms, the exceptions to the Act are undefined and have no clear or obvious meaning. For example, the law's inapplicability to "[i]mages involving voluntary exposure in a public or commercial setting," Ariz. Rev. Stat. Ann. § 13-1425(B)(3), gives Plaintiffs "no idea" how to interpret these undefined terms to avoid criminal liability. Bookmans Decl. ¶ 14; VMG Decl. ¶ 17; Antigone Books Decl. ¶ 12. While an "expectation of privacy" is a legally-defined and interpreted term, "public or commercial setting" is not. Nor can Plaintiffs confidently assess the setting where a photograph is taken as commercial or public from merely viewing the image. AAP Decl. ¶ 19; Copper News Decl. ¶ 19. These vague exceptions provide little comfort for booksellers, other Plaintiffs, and third parties.

### C. Plaintiffs are Likely to Prevail on Their Commerce Clause Claims

The Act violates the Commerce Clause in three ways. First, it regulates commercial activity occurring entirely in other states. Second, it regulates inherently interstate activity, creating the risk of inconsistent standards. Third, it imposes an undue burden on interstate commerce unjustified by unique local benefits. In *Goddard*, this Court struck down a statute materially similar to the Act for these reasons. *See* 2004 WL 3770439, at *2.

The law at issue in *Goddard* imposed "severe restrictions on the dissemination of constitutionally-protected speech on the Internet by making it a crime to 'intentionally or knowingly transmit or send' by means of 'electronic mail, personal messaging or any

other direct [I]nternet communication' any 'item' that is 'harmful to minors.'" *Id.* at *2. This Court found that the law violated the Commerce Clause because without any textual limitation, it burdened Internet activity occurring entirely outside of Arizona. *Id.* The same is true here.

Our federal system necessarily forbids one state from directly regulating commercial activity occurring entirely outside its borders or regulating in-state conduct with the "practical effect of exporting that state's domestic policies" to every other state. *Am. Libraries Ass'n. v. Pataki*, 969 F. Supp. 160, 174 (S.D.N.Y. 1997); *see also Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) ("The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."). The Act falls within this proscription. Booksellers both inside and outside of Arizona offer, to readers across the nation, millions of books for sale online, including books containing restricted images. ABFFE Decl. ¶¶ 8, 15. The covers of these books—some of which include images of nudity—are displayed online. *Id.* ¶ 15. To comply with the Act, these booksellers (both in Arizona and in other states) would have to remove any images of nudity or sexual activity from their websites (lest they display such images in Arizona), and would have to undertake measures to ensure that no one in Arizona could purchase the books. *Id.* ¶¶ 17-18. Unless booksellers were able to undertake the impossible and cost-prohibitive task of going page-by-page through every book that a customer requested be shipped to Arizona to ensure that the book did not contain images prohibited by the Act, the booksellers could be forced to remove all such books from their websites entirely. *Id.* ¶ 18. If the bookstores were forced to do so, the result would be that a reader in, *e.g.*, Illinois who sought to purchase a book from a bookseller in, *e.g.*, Colorado would be prevented from purchasing the book online because the bookseller had removed the book from its website to comply with the Arizona Act. *Id.* ¶ 17. The Act also has an impact on FTRF member libraries outside of Arizona. Many non-Arizona libraries participate in Interlibrary Loans to Arizona libraries. FTRF Decl. ¶ 13. To comply with the Act, the non-Arizona libraries would have to either (a) set up a restriction on the Interlibrary Loan

program to ensure that restricted works were not loaned to Arizona libraries or persons in Arizona, or (b) to maintain a uniform Interlibrary Loan program, remove such restricted works entirely, thus denying libraries (and their patrons) in other states the opportunity to borrow such works. *Id*. Through this latter effect, the Act not only impacts commerce between other states and Arizona, but also impacts interstate commerce that takes place entirely outside of Arizona. *Id*. This is impermissible. *See Goddard*, 2004 WL 3770439, at *2.

The Act also runs afoul of the Commerce Clause because it violates the long-established rule barring states from enacting differing standards for instrumentalities of national commerce where uniformity is required. *Pataki*, 969 F. Supp. at 181-82 (collecting authority). Just as trucks and trains carry tangible items interstate, the Internet transmits speech and commercial goods interstate:

> The Internet, like rail and highway traffic at issue in the cited cases, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations. Regulation on a local level, by contrast, will leave users lost in a welter of inconsistent laws…

*Id*. at 182. If the Act is permitted to stand, and if other states enact their own statutes with different provisions on what constitutes consent, and what images are restricted, Plaintiffs simply will not be able to function in interstate commerce. *See Stevens*, 559 U.S. at 476 ("Those seeking to comply with the law [would thus] face a bewildering maze of regulations from at least 56 separate jurisdictions."). Under those circumstances, for example, a bookseller could be required to maintain a separate online catalog for every state—ensuring that Arizonians could not purchase books banned in Arizona, that Texans could not purchase books banned in Texas, and so on. The First Amendment and the Commerce Clause prevent that result.

Finally, "[e]ven if the Act were not a *per se* violation of the Commerce Clause by virtue of its extraterritorial effects, the Act [is] nonetheless [] an invalid indirect regulation of interstate commerce, because the burdens it imposes on interstate commerce are excessive in relation to the local benefits it confers." *Pataki*, 969 F. Supp. at 177; *see also*

*ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) (*same conclusion with respect to New Mexico statute*); *Goddard*, 2004 WL 3770439 at *2 (so holding in striking down Arizona statute as unconstitutional); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 890-91 (W.D. Va. 2001) (granting summary judgment and holding same Virginia statute unconstitutional); *PSINet, Inc. v. Chapman*, 108 F. Supp. 2d. 611, 626-27 (W.D. Va. 2000) (same in granting preliminary injunction against enforcement of Virginia statute).

This is consistent with a long line of Supreme Court jurisprudence. *See*, *e.g.*, *Edgar v. Mite Corp.*, 457 U.S. 624, 643-44 (1982); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

### D. Plaintiffs Face Irreparable Injury and the Public Interest Favors Injunction

Where Plaintiffs have demonstrated a likelihood of success on First Amendment claims, the Ninth Circuit also finds grounds for irreparable injury. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009) ("Given the free speech protections at issue in this case, however, it is clear that these requirements are satisfied."); *see also Elrod*, 427 U.S. at 373 (finding irreparable injury to Plaintiffs where their "First Amendment interests were either threatened or in fact being impaired at the time relief was sought" and affirming injunction).

Plaintiffs have detailed how the Act places them "between Scylla and Charybdis"—a choice between risking felony prosecution and self-censorship. This is no hypothetical concern. As recounted in detail in the Voice Media Group Declaration, Maricopa County law enforcement has previously marshaled its resources against the publication of non-obscene, nude, and fully-protected speech. VMG Decl. ¶¶ 25-26.

The public interest in protecting First Amendment rights, and the balance of harms, also support a preliminary injunction. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

**Conclusion**

The Act violates the First Amendment, the Due Process Clause, and the Commerce Clause. In doing so, it causes severe and irreparable harm to the constitutional rights of Plaintiffs, their members, officers, employees, customers, patrons, and readers. Plaintiffs respectfully ask this Court to enjoin enforcement of the Act pending the final determination of this action.

Dated: November 3, 2014

Respectfully submitted,

/s/ Lee Rowland
Lee Rowland (admitted *pro hac vice*)
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Email: lrowland@aclu.org

Daniel Pochoda (Bar No. 021979)
Victoria Lopez (Bar No. 330042)**
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85011-0148
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
            vlopez@acluaz.org

**Admitted pursuant to Ariz. Sup.
  Ct. R. 38(f)

/s/ Joshua S. Akbar
Joshua S. Akbar (State Bar No. 025339)
DENTONS US LLP
2398 E. Camelback Road, Suite 850
Phoenix, AZ 85016-9016
Telephone: (602) 508-3900
Email: joshua.akbar@dentons.com

Michael A. Bamberger
(admitted *pro hac vice*)
Richard M. Zuckerman
(admitted *pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Email: michael.bamberger@dentons.com
            richard.zuckerman@dentons.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2014, I electronically transmitted the attached

Motion for Preliminary Injunction and Memorandum and Declarations in Support to the

Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

Electronic Filing to the following CM/ECF registrants:

David Daniel Weinzweig
Office of the Attorney General - Phoenix
1275 W Washington St.
Phoenix, AZ 85007-2997
602-542-7989
Fax: 602-364-2214
Email: david.weinzweig@azag.gov

Robert Lawrence Ellman
Office of the Attorney General - Phoenix
1275 W Washington St.
Phoenix, AZ 85007-2997
602-542-8696
Fax: 602-542-8308
Email: robert.ellman@azag.gov

Stephanie Susan Elliott
Office of the Attorney General
15 S 15th Ave.
Phoenix, AZ 85007
602-542-8555
Email: Stephanie.Elliott@azag.gov

Joseph D Young
Apache County Attorneys Office
P.O. Box 637
Saint Johns, AZ 85936
928-337-7560
Email: jyoung@apachelaw.net

Elda E Orduno
Cochise County Attorney
P.O. Box CA
Bisbee, AZ 85603
520-432-8700
Email: eorduno@cochise.az.gov

Jessica Lynn Zornes Leiser
Coconino County Attorneys Office
110 E Cherry Ave.
Flagstaff, AZ 86001-4627
928-679-8200
Fax: 928-679-8201
Email: jleiser@coconino.az.gov


William P Ring
Coconino County Attorneys Office
110 E Cherry Ave.
Flagstaff, AZ 86001-4627
928-679-8200
Fax: 928-679-8201
Email: wring@coconino.az.gov


Bryan B Chambers
Gila County Attorneys Office
1400 E Ash St
Globe, AZ 85501
928-425-3231
Fax: 928-425-3720
Email: bchambers@co.gila.az.us


Kenneth Andrew Angle
Graham County Attorneys Office
800 W Main St
Safford, AZ 85546
928-428-3620
Fax: 928-428-7200
Email: kangle@graham.az.gov


Derek D Rapier
Greenlee County Attorneys Office
P.O. Box 1717
Clifton, AZ 85533-1717
928-865-4108
Fax: 928-865-4665
Email: drapier@co.greenlee.az.us


Robert Glenn Buckelew
La Paz County Attorney
1008 Hopi Ave
Parker, AZ 85344
928-669-4969
Email: gbuckelew@co.la-paz.az.us

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dolores Holmes Milkie
Mohave County Attorneys Office
PO Box 7000
Kingman, AZ 86402
928-753-0770
Fax: 928-753-4290
Email: dolores.milkie@co.mohave.az.us


Robert Alexander Taylor
Mohave County Attorneys Office
City Attorney
PO Box 7000
Kingman, AZ 86402-7000
928-753-0770
Fax: 928-753-4290
Email: robert.taylor@co.mohave.az.us


Brandt S Clark
Navajo County Attorneys Office
P.O. Box 668
Holbrook, AZ 86025
928-524-4307
Email: brandt.clark@navajocountyaz.gov


Jason Stanley Moore
Navajo County Attorneys Office
P.O. Box 668
Holbrook, AZ 86025
928-524-4307
Fax: 928-524-4307
Email: jason.moore@navajocountyaz.gov


Kelli Lynn Olson
Pima County Attorneys Office
32 N Stone Ave., Ste. 2100
Tucson, AZ 85701
520-740-5750
Email: Kelli.Olson@pcao.pima.gov


Lesley Maura Lukach
Pima County Attorney's Office
32 N Stone Ave., Ste. 2100
Tucson, AZ 85701
520-740-5750
Fax: 520-620-6556
Email: Lesley.Lukach@pcao.pima.gov

Courtney Rachel Glynn
Pinal County Attorneys Office
P.O. Box 887
Florence, AZ 85232-0887
520-866-6271
Email: Courtney.Glynn@pinalcountyaz.gov

Seymour Garry Gruber , II
Pinal County Attorneys Office
PO Box 887
Florence, AZ 85232
520-866-6271
Fax: 520-866-6521
Email: seymour.gruber@pinalcountyaz.gov

Charlene Ann Laplante
Santa Cruz County Attorney
2150 N Congress Dr., Ste. 201
Nogales, AZ 85621-1090
520-375-7704
Email: claplante@co.santa-cruz.az.us

Benjamin David Kreutzberg
Yavapai County Attorneys Office
255 E Gurley St.
Prescott, AZ 86301
928-771-3344
Fax: 928-771-3110
Email: ben.kreutzberg@yavapai.us

William J Kerekes
Yuma County Attorneys Office
250 W 2nd St Ste G
Yuma, AZ 85364
928-817-4300
Fax: 928-817-4321
Email: YCAttyCivil@yumacountyaz.gov

On the same date, copies of the foregoing were mailed to the following parties who have not yet registered for the ECF system for this case:

Bill Montgomery
Maricopa County Attorney
301 Jefferson St., Suite 800
Phoenix, AZ 85003-2143


 *s/ T. McGrew*
T. McGrew

83297728